2024-1177

# United States Court of Appeals for the Federal Circuit

**POWERBLOCK HOLDINGS, INC.,**

*Plaintiff-Appellant*

**v.**

**IFIT, INC.,**

*Defendant-Appellee*

*Appeal from the United States District Court for the District of Utah in Case No. 1:22-CV-00132*

## CORRECTED OPENING BRIEF OF PLAINTIFF-APPELLANT POWERBLOCK HOLDINGS, INC.

Thomas J. Leach
Michael A. Erbele
MERCHANT & GOULD P.C.
150 South Fifth Street
Suite 2200
Minneapolis, MN 55402
(612) 332-5300

Joshua A. Hartman
MERCHANT & GOULD P.C.
1900 Duke Street, Suite 600
Alexandria, VA 22314
(703) 684-2500

February 13, 2024

*Attorneys for Plaintiff-Appellant*

**U.S. Patent No. 7,578,771 Claims 1, 2, 5, 7, 8, 9, 12, 15, and 20**

**1**. A weight selection and adjustment system for a selectorized dumbbell, which comprises:

(a) a selectorized dumbbell, which comprises:

(i) a stack of nested left weight plates and a stack of nested right weight plates;

(ii) a handle having a left end and a right end; and

(iii) a movable selector having a plurality of different adjustment positions in which the selector may be disposed, wherein the selector is configured to couple selected numbers of left weight plates to the left end of the handle and selected numbers of right weight plates to the right end of the handle with the selected numbers of coupled weight plates differing depending upon the adjustment position in which the selector is disposed, thereby allowing a user to select for use a desired exercise weight to be provided by the selectorized dumbbell; and

(b) an electric motor that is operatively connected to the selector at least whenever a weight adjustment operation takes place, wherein the electric motor when energized from a source of electric power physically moves the Selector into the adjustment position corresponding to the desired exercise weight that was selected for use by the user.

**2**. The system of claim **1**, further comprising:

(a) an electrically operated data entry device to allow the user to input the desired exercise weight; and

(b) a controller operatively communicating with the data entry device and the electric motor for energizing the electric motor from the electric power source to cause the electric motor to move the selector to the adjustment position thereof that corresponds to the desired exercise weight input by the operator into the data entry device.

**5**. The system of claim **2**, further comprising:

(a) a stand on which the selectorized dumbbell is supported during a weight adjustment operation;

(b) wherein the motor is mounted on the stand; and

(c) a driver releasably connected to the selector of the dumbbell when the dumbbell is on the stand with the driver being driven by the motor when the motor is energized.

**7**. The system of claim **5**, further comprising a sensor for detecting when the selectorized dumbbell is in a proper weight adjusting position on the stand, and wherein the sensor is operatively connected to the controller for inhibiting a weight adjustment operation unless the sensor reports to the controller that the

selectorized dumbbell has been placed in the proper weight adjusting position on the stand.

**8**. The system of claim **5**, further comprising a device configured to grip the selectorized dumbbell for retaining the selectorized dumbbell in the proper weight adjusting position on the stand during a weight adjustment operation.

**9**. The system of claim **8**, wherein the gripping device comprises a plurality of fingers movably Supported on the stand for movement between a first position in which the fingers are clear of the selectorized dumbbell and a second position in which the fingers overlie portions of the selectorized dumbbell to hold the selectorized dumbbell in place on the stand.

**12**. The system of claim **1**, further including a plurality of selectorized dumbbells of the type recited in claim 1, and wherein a single electric motor is operatively connected to the selectors of the plurality of selectorized dumbbells at least whenever a weight adjustment operation takes place Such that only one motor adjusts the selectors of both dumbbells substantially simulataneously [*sic*].

**15**. The system of claim **1**, further comprising:

(a) a stand on which the selectorized dumbbell is supported during a weight adjustment operation;

(b) wherein the motor is mounted on the stand; and

(c) a driver releasably connected to the selector of the dumbbell when the dumbbell is on the stand with the driver being driven by the motor when the motor is energized.

**20**. A weight selection and adjustment system for a dumbbell, which comprises:

(a) a dumbbell that provides an exercise weight that is lifted by a user when the user grips and lifts a handle of the dumbbell, wherein the exercise weight provided by the dumbbell is adjustable by coupling more or fewer weight plates to each end of the handle;

(b) an electric motor that may be selectively energized and when energized will cause a desired number of weight plates to be coupled to each end of the handle; and

(c) a data entry device to allow the user to input a weight Selection decision that operatively controls the energization of the motor to adjust the exercise weight of the dumbbell in accordance with the weight selection decision input into the data entry device by the user.

## CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rules 28(a)(1) and 47.4, Counsel for Plaintiff-Appellant PowerBlock Holdings, Inc., certifies the following:

1. The full name of the party represented by me is:

   PowerBlock Holdings, Inc.

2. The name of the Real Party in interest represented by me is:

   N/A

3. Parent corporations and publicly held companies that own 10% or more of the stock in the party:

   PowerBlock Holdings, Inc. hereby states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court (and who have not or will not enter an appearance in this case) are:

   Cameron M. Hancock, James T. Burton and Michael A. Eixenberger of KIRTON MCCONKIE

   Taylor R. Stemler of MERCHANT & GOULD P.C.

5. The title and number of any case known to counsel to be pending in this or any other court or agency, other than the originating case, that will directly affect or be directly affected by this court's decision in the pending appeal:

N/A

6. Organizational Victims and Bankruptcy Cases:

N/A

Dated: February 13, 2024

/s/ Thomas J. Leach
Thomas J. Leach

*Attorneys for Plaintiff-Appellant PowerBlock Holdings, Inc.*

## TABLE OF CONTENTS


STATEMENT OF RELATED CASES ........................................................ 1

JURISDICTIONAL STATEMENT ........................................................ 1

STATEMENT OF THE ISSUES ........................................................ 3

STATEMENT OF THE CASE ........................................................ 3

I. INTRODUCTION ........................................................ 3

II. FACTUAL BACKGROUND ........................................................ 6

A. The Parties ........................................................ 6

B. The Field of Selectorized Dumbbells and the Problems That Existed in the Art Before the ’771 Patent ........................................................ 7

C. The ’771 Patent’s Invention: An Integrated Selectorized Dumbbell System with Motorized Weight Adjustment ........................................................ 8

D. The ’771 Patent’s Invention Provides Advantages Over Prior Art Selectorized Dumbbells ........................................................ 12

1. The claimed systems are safer than prior art devices ........................................................ 12

2. The claimed systems provide new functionalities that make them easier to use than prior art devices ........................................................ 13

E. The ’771 Patent Specifically Claims the Improved Systems ........................................................ 14

III. THE DISTRICT COURT’S MOTION TO DISMISS RULING ........................................................ 17

SUMMARY OF THE ARGUMENT ........................................................ 20

ARGUMENT ........................................................ 24

I. STANDARD OF REVIEW ........................................................ 24

II. THE DISTRICT COURT ERRED IN CONCLUDING THAT THE CLAIMS AT ISSUE ARE DIRECTED TO EXCLUDED SUBJECT MATTER ........................................................ 25

A. The Claims at Issue Are Directed to Specific Means That Solve Problems with Prior Art Selectorized Dumbbell Systems—Not to an Abstract Idea 27

1. The Claims at Issue each recite specific systems ........................................................ 27

2. The systems of the Claims at Issue each solve technical problems with prior art selectorized dumbbells ........................................................ 30

B. Considering the Claims at Issue in the Context of This Court’s § 101 Case Law Confirms They Are Patent-Eligible ........................................................ 32

1. The Court's *EcoServices* decision confirms that the Claims at Issue are not abstract ........ 32

2. The district court relied on inapposite cases involving the claimed use of a computer to automate a mental process ........ 36

C. The District Court Committed Four Errors in Its *Alice* Step One Analysis .......... 39

1. The district court erred by focusing on the breadth of claim 20 rather than what the claims are "directed to" ........ 39

2. The district court erred by oversimplifying the claims by looking at them generally and reading out claim limitations ........ 43

3. The district court erred by improperly treating claim 20 as representative of the Claims at Issue ........ 48

4. The district court erred by disregarding the claimed invention's advantages over the prior art ........ 50

III. THE DISTRICT COURT ERRED BY MAKING IMPROPER FACTUAL FINDINGS UNDER *ALICE* STEP TWO ........ 52

A. The Claims at Issue Recite Several Inventive Concepts ........ 53

B. The District Court Based Its Step Two Analysis on Inappropriate, Unsupported Factual Findings at the Pleadings Stage ........ 54

C. The District Court Disregarded the Claimed Systems' Advantages by Relying on Inapposite Cases Concerning Generic Computers ........ 57

CONCLUSION ........ 58

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121 (Fed. Cir. 2018) ....................25, 54, 56, 57

*ADASA Inc. v. Avery Dennison Corp.*, 55 F.4th 900 (Fed. Cir. 2022) ....................30, 32

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014).................... *passim*

*Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Can. (U.S.)*, 687 F.3d 1266 (Fed. Cir. 2012) ....................37, 38

*Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016) ....................52

*Berkheimer v. HP Inc.*, 881 F.3d 1360 (Fed. Cir. 2018) .................... *passim*

*CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358 (Fed. Cir. 2020) .................... *passim*

*Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306 (Fed. Cir. 2019) ....................25

*Chamberlain Grp. v. Techtronic Indus. Co.*, 935 F.3d 1341 (Fed. Cir. 2019) ....................34, 35

*ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759 (Fed. Cir. 2019) ....................34, 35

*Coop. Ent., Inc. v. Kollective Tech., Inc.*, 50 F.4th 127 (Fed. Cir. 2022) ....................25, 54

*Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044 (Fed. Cir. 2017) ....................37

*EcoServices, LLC v. Certified Aviation Servs., LLC*, 830 F. App'x 634 (Fed. Cir. 2020) .................... *passim*

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016) ................................................................*passim*

*Ficep Corp. v. Peddinghaus Corp.*,
No. 2022-1590, 2023 WL 5346043 (Fed. Cir. Aug. 21, 2023)....................37, 38

*Ioengine, LLC v. Paypal Holdings, Inc.*,
607 F. Supp. 3d 464 (D. Del. 2022)............................................................39, 40

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
837 F.3d 1299 (Fed. Cir. 2016) ................................................................*passim*

*Rsch. Corp. Techs., Inc. v. Microsoft Corp.*,
627 F.3d 859 (Fed. Cir. 2010) .....................................................................30

*Straub v. Burlington N. Santa Fe Ry. Co.*,
909 F.3d 1280 (10th Cir. 2018) ..................................................................24, 54

*In re TLI Commc'ns LLC Patent Litig.*,
823 F.3d 607 (Fed. Cir. 2016) .....................................................................37

*Univ. of Fla. Rsch. Found., Inc. v. Gen. Elec. Co.*,
916 F.3d 1363 (Fed. Cir. 2019) ..................................................................36, 47

**Statutes**

28 U.S.C. § 1295(a)(1)...................................................................................2

28 U.S.C. § 1331 ...........................................................................................1

28 U.S.C. § 1338 ...........................................................................................1

35 U.S.C. § 101 ........................................................................................*passim*

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5(a), Appellant states no other appeal from this civil action was previously before this or any other appellate court. Further, pursuant to Federal Circuit Rule 47.5(b), Appellant states that it is not aware of any other case or proceeding pending in this or any other court or agency that the outcome of this appeal will affect.

## JURISDICTIONAL STATEMENT

Appellant PowerBlock Holdings, Inc. ("PowerBlock") filed this action against Appellee iFIT ("iFIT"), asserting one count of patent infringement of U.S. Patent No. 7,578,771 (the "'771 Patent"), and one count of unlawful and unfair intentional business acts under the Utah Unfair Competition Act, Utah Code § 13-5a-103, based on iFIT's bad-faith infringement of the '771 Patent. Appx053. The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) and (b).

On September 29, 2023, the district court issued a Memorandum Decision & Order Granting in Part and Denying in Part Defendant's Motion to Dismiss ("the Order"), which held that claims 1-18 and claim 20 of the '771 Patent are ineligible for patenting under 35 U.S.C. § 101. Appx019-020. The Order denied dismissal of '771 Patent claim 19 and of the Utah Unfair Competition Act claim. Appx019-020.

On October 24, 2023, pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii), the Parties stipulated to dismissal of the claim for infringement of

’771 Patent claim 19 and of the Utah Unfair Competition Act claim. Appx282. The Parties further stipulated that PowerBlock shall not reassert either of these claims before filing or during pendency of an appeal of the Order; waives its rights to reassert those claims if the Order is affirmed on appeal; but could reassert those claims if the Order is not affirmed, effecting finality of the action. Appx282.

On November 10, 2023, PowerBlock timely filed a notice of appeal. Appx026. The notice of appeal was docketed on November 21, 2023. Dkt. 1-1 (Not. of Docketing). This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1. Whether the district court erred in concluding that claims 1–18 and 20 of the ’771 Patent (the “Claims at Issue”), which recite motorized adjustable-weight dumbbell systems that use specially configured mechanical components to couple weight plates to the dumbbell handles, are directed to an abstract idea under step one of *Alice Corp. Pty. Ltd. v. CLS Bank International*, 573 U.S. 208 (2014) (“*Alice* Step One”).

2. Whether the district court erred in concluding, on a Rule 12(b)(6) motion to dismiss, that the Claims at Issue lack an inventive concept under step two of the *Alice Corp.* test (“*Alice* Step Two”) based on factual findings that were contrary to the pleadings.

## STATEMENT OF THE CASE

### I. INTRODUCTION

In *Alice Corp.*, the Supreme Court advised courts to “tread carefully in construing” the “abstract ideas” exclusion from § 101 “lest it swallow all of patent law.” 573 U.S. at 217 (citation omitted). This Court has heeded this advice by focusing its application of the “abstract ideas” exclusion largely on claims directed to the use of generic computers to perform fundamental financial or business processes or to manipulate or communicate data.

The Claims at Issue here are far different. They recite improved adjustable-weight dumbbell systems that motorize the addition and removal of weight plates to each end of the dumbbells' handles via tangible components such as electric motors, movable weight selectors, belts and pulleys, rotatable drivers, and gripping fingers. As explained in the '771 Patent, these systems provide technical improvements over the prior art, such as enhanced safety and new functionalities such as remote weight adjustment and simultaneous weight adjustment for a pair of dumbbells. The below figures from the '771 Patent's written description illustrate the claimed systems' arrangements of mechanical components. These systems are foundationally protectible under § 101, which allows patents for "any new and useful . . . machine" or improved machine. 35 U.S.C. § 101. This Court has never held such claims to be ineligible for patenting.







FIG. 6




FIG. 15

Yet on a Rule 12(b)(6) motion to dismiss, the district court incorrectly found the Claims at Issue patent-ineligible under § 101. Its decision bears no resemblance

to the careful application of the "exclusion principle" required by *Alice Corp.* Rather, the district court committed reversible error under both steps of the *Alice Corp.* test.

Under *Alice* Step One, the district court erred as a matter of law by:

- misapplying the applicable standard by focusing not on what the Claims at Issue are "directed to," but on their breadth;
- oversimplifying the Claims at Issue by characterizing them at an unduly high level of generality and reading out most of the claim language;
- improperly treating claim 20 as representative; and
- ignoring the advantages of the claimed invention described in the specification.

Under *Alice* Step Two, the district court misapplied both § 101 and the Rule 12(b)(6) standard. That standard required taking as true PowerBlock's factual allegations—including statements in the '771 Patent itself—and drawing all factual inferences in PowerBlock's favor. Instead, the district court found the recited claim elements to be "generic," "routine," and "conventional" based solely on Defendant-Appellee iFIT's attorney argument; the court identified no support in the pleadings for these incorrect factual findings.

The district court's misapplication of the *Alice Corp.* test and improper factual findings resulted in an unprecedented decision that contradicts § 101's plain

language as to the patentability of "machine[s]." Letting that incorrect decision stand would disfigure § 101 and eviscerate patentability, creating untenable uncertainty.

And the particular result in this case would be fundamentally unfair. PowerBlock, an innovator in weightlifting technologies and a pioneer of selectorized dumbbells, would lose the patent protection it had for more than 14 years. This loss would leave PowerBlock vulnerable to iFIT, a latecomer that filed for and obtained similar patent protection on a motorized adjustable dumbbell about a decade later. Because the Claims at Issue are patent eligible, the district court's decision should be reversed.

## II. FACTUAL BACKGROUND

### A. The Parties

PowerBlock is a leader in the weightlifting and fitness equipment industry. Appx054-055(¶¶ 12-13). Since its founding over 30 years ago, PowerBlock has climbed to this position based on the strength of its innovations, for which it has received numerous United States and foreign patents. Appx054-055(¶¶ 12-13, 15). These patented innovations include inventions relating to adjustable-weight dumbbells, or "selectorized dumbbells" as they are known in the art. Appx044(1:41-48). Examples of PowerBlock's pioneering selectorized dumbbells include the below products:



Appx055.

iFIT competes directly with PowerBlock in the adjustable dumbbell space. Appx056(¶ 20). iFIT sought a patent on a similar motorized selectorized dumbbell system, which the Patent and Trademark Office initially rejected as obvious over PowerBlock's '771 Patent. Appx112; Appx118; Appx222-223.

### B. The Field of Selectorized Dumbbells and the Problems That Existed in the Art Before the '771 Patent

The '771 Patent relates to selectorized dumbbells. As the patent explains, these dumbbells can include two stacks of weights—a left stack, and a right stack, with a gap between them. Appx044(1:24-28). In prior art devices, the user could insert a dumbbell handle into the gap and manipulate a mechanical member called a "selector" to couple weights from each stack to the handle. Appx044(1:30-33). After positioning the selector, the user could lift the handle and use the dumbbell in various exercises. Appx044(1:33-37).

The '771 Patent explains that manually adjusted selectorized dumbbells suffered from several drawbacks. Appx044(1:38-67). One problem related to safety.

Because the mechanical selector had to "be directly gripped and manipulated," a user might fail to "fully or correctly engage" it. Appx044(1:38-51). This could cause the dumbbell's weights to "detach from the handle" during operation, injuring the user and damaging the dumbbell. Appx044(1:51-54).

Another problem related to ease of use. Adjusting the weight of manual selectorized dumbbells was cumbersome, particularly because many exercises require a pair of dumbbells, and such manual devices required users to adjust the weight of on dumbbells at a time. Appx044(1:55-56). In the prior art, users would first have to move a selector into position for the desired weight on one dumbbell, next move a different selector into position for that weight on the other dumbbell, and then confirm that the selectors were identically positioned, such that both dumbbells carried the same weight. Appx044(1:56-64). Because a small movement could shift the selector into the wrong position, users had to pay "close attention" throughout this process. Appx044(1:64-67).

### C. The '771 Patent's Invention: An Integrated Selectorized Dumbbell System with Motorized Weight Adjustment

To address prior art selectorized dumbbells' disadvantages, the '771 Patent teaches and claims an "overall, integrated system for selecting and adjusting the weight of a selectorized dumbbell or a pair of selectorized dumbbells" that uses an electric motor configured to cause weights to be added to and removed from each end of the dumbbell handles. Appx044(1:15-19). In the described embodiments,

weight adjustment occurs when the dumbbells (element 6 below) are placed on a stand that includes left and right stacks of weights (elements 16 and 18):




*’771 Patent, Fig. 2, perspective view of system with one dumbbell*




*’771 Patent, Fig. 4, overhead view of system with a pair of dumbbells*

The stand includes an electric motor 46 operatively connected to selector 35, a hardware component that can be moved into positions corresponding to different numbers of weight plates. Appx046, Appx044(6:31-42, 1:30-33). The electric motor is configured to move the selector into the weight adjustment position for the user’s desired weight when the motor is energized. Appx044(2:29-33).




*’771 Patent, Fig. 8, perspective view of selectorized dumbbell handle*




*’771 Patent, Fig. 9, bottom plan view of Fig. 8*

The systems described by the ’771 Patent include a “data entry device 62” for users to input a desired weight selection for the dumbbell or dumbbells. Appx046(6:57-60). Entering a weight selection decision causes electric power to be selectively applied to the motor, which then causes the selector to be moved into position for the entered weight. Appx047(7:1-32). Per the ’771 Patent, prior art selectorized dumbbells had not previously used data entry devices. The patent explains that while such devices had been used in the realm of consumer electronics, “no similar data entry device has been used to adjust the numbers of weights coupled to each end of the handle of a selectorized dumbbell.” Appx044(2:6-10).

The ’771 Patent also describes and claims several safety components that the disclosed selectorized dumbbell systems can include. The patent teaches electronic sensors mounted on the stand that detect whether a dumbbell is properly positioned

for weight adjustment and inhibit adjustment when it is not. Appx047(7:42-54). The patent also teaches "interlock fingers" that grip the dumbbells placed on the stand, holding them in place during weight adjustment operations to prevent a user from picking them up too soon. Appx047(7:59-62; 8:13-16).

In addition, the '771 Patent discloses different arrangements of the overall system. In one arrangement, a single electric motor coordinates with selectors corresponding to different dumbbells, so that the system simultaneously adjusts the weights of a pair of dumbbells. Appx049(11:7-12; claim 12). In another arrangement, the dumbbell itself contains the "entire weight adjustment system," including the data entry device, selector, and motor. Appx048-049(10:64-67; 11:1).




*'771 Patent, Fig. 16, perspective view,*
*dumbbell includes its own weight adjustment system*

### D. The '771 Patent's Invention Provides Advantages Over Prior Art Selectorized Dumbbells

The '771 Patent's written description explains how its motorized weight adjustment systems improve upon prior art selectorized dumbbells. As discussed below, the improved systems are safer, easier to operate, and provide new functionalities, including remote and simultaneous weight adjustment.

#### 1. The claimed systems are safer than prior art devices

The systems of the Claims at Issue are safer than prior art systems. Per the written description, the improved systems solved the problem of prior art selectorized dumbbells' weights detaching during use when a user incorrectly engaged the manual selector. Appx044(1:38-54). Through use of an electric motor configured to adjust the selector to the position corresponding to the weight entered via the data entry device, the improved systems motorize weight adjustment so that the user does not "physically or directly position or manipulate [the] selector . . . ." Appx047(7:36-40). The improved systems also eliminate "external tether cords or the like which can catch on obstacles and cause a manually positioned selector pin to dislodge[,] as [wa]s the case with prior art selectorized dumbbells." Appx048(10:48-51).

The specially configured sensors and gripping fingers that hold the dumbbell in place during weight adjustment further enhance safety. Appx049(11:27-37). As the patent explains, these novel, nonconventional safety elements "minimize[] the

chance for operator error" in weight adjustment and "ensure[] that [the] selector . . . is properly engaged" before a user can lift the dumbbells. Appx049-50(11:34-37).

### 2. The claimed systems provide new functionalities that make them easier to use than prior art devices

The claimed systems also improve upon prior art selectorized dumbbells by adding new functionalities that make them easier and simpler to operate. While the sequential process for adjusting the weights of a pair of prior art selectorized dumbbells was laborious, the claimed systems' use of specially configured electric motors and data entry devices enable functionalities that improve use and operation of the '771 Patent's improved systems. Appx044(2:4-6).

First, the claimed systems allow for remote weight adjustment "since the user need only touch and manipulate [the] data entry device . . . and not [the] dumbbells . . . themselves." Appx049(11:19-20). This remote adjustment was impossible in prior art selectorized dumbbells, which required users to "directly grip[] and manipulate[]" each dumbbell's mechanical weight selection components. Appx044(1:38-41).

Second, the claimed systems allow the weight in a pair of dumbbells to be adjusted simultaneously. Appx049(11:24-26). The '771 Patent describes how a single electric motor can "adjust[] the selectors of both dumbbells substantially simultaneously" through use of a "single electric motor." Appx045(3:36-40), Appx046(6:45-56), Appx050(13:6-34). By contrast, in prior art selectorized

dumbbells, "the user first ha[d] to adjust the selector on one of the dumbbells to whatever weight [wa]s desired. Then, the user [had to] repeat the procedure for the second dumbbell . . . ." Appx044(1:57-67).

### E. The '771 Patent Specifically Claims the Improved Systems

The '771 Patent specifically claims the systems that provide the above advantages. Independent claims 1 and 20 each recite specific systems comprising mechanical components configured to motorize weight adjustment. Claim 20 recites a "weight selection and adjustment system for a dumbbell" that comprises:

> (a) [a] dumbbell that provides an exercise weight that is lifted by a user when the user grips and lifts a handle of the dumbbell, wherein the exercise weight [it] provide[s] . . . is adjustable by coupling more or fewer weight plates to each end of the handle;
>
> (b) an electric motor that may be selectively energized and when energized will cause a desired number of weight plates to be coupled to each end of the handle; and
>
> (c) a data entry device to allow the user to input a weight selection decision that operatively controls the energization of the motor to adjust the exercise weight of the dumbbell in accordance with th[at] weight selection decision . . . .

Appx050(14:33-47). As required by claim 20, the recited system mechanically adjusts the dumbbell's weight by using a "data entry device" to allow the user to input a weight selection decision that controls the energization of the motor. When so selectively energized, the motor causes the coupling of more or fewer weight

plates to each end of the dumbbell's handle to reach the weight that corresponds to the weight selection decision.

Claim 1 is similar but distinct. It also recites a "weight selection and adjustment system for a dumbbell," but it requires a "selectorized dumbbell" that includes "nested" left and right weight plates, a handle, and a "movable selector having a plurality of different adjustment positions in which the selector may be disposed." Appx049(11:54-62). The "selector is configured to couple selected numbers" of left and right weight plates to the corresponding ends of the handle depending on the adjustment position in which it is disposed. Appx049(11:62-67; 12:1). The claimed system also includes "an electric motor that is operatively connected to the selector." Appx049(12:4-5). When the electric motor is "energized from a source of electric power," it "physically moves the selector into the adjustment position" corresponding to the user's selected exercise weight. Appx049(12:6-10).

Dependent claim 2 adds to the system of claim 1 "an electrically operated data entry device to allow the user to input the desired exercise weight" and a "controller operatively communicating with the data entry device and the electric motor for energizing the motor" to cause it to move the selector as required for weight adjustment. Appx049(12:11-19). And dependent claim 5 adds to the system of claim 2: (i) a stand that supports the selectorized dumbbell during weight adjustment

operations and on which the motor is mounted and (ii) a "driver releasably connected to the selector" when the dumbbell is positioned on the stand, with the "driver being driven by the motor when the motor is energized." Appx049(12:29-37).

By reciting these specific components, working together in combination in specific ways, the systems of claims 1, 2, 5, and 20 perform weight adjustment without the user having to physically grip and manipulate the selector. This makes the systems safer and easier to operate. Appx048(10:48–55). Further, by cooperating to add and remove weight to the handle, the recited components enable remote weight adjustment, which prior art devices did not provide. Appx049(11:14-26).

In addition, dependent claims 7–11 add to the system of claim 5 the safety features described in the specification that ensure the dumbbell remains properly positioned during weight adjustment operations. Claim 7 adds "a sensor for detecting when the selectorized dumbbell is in a proper weight adjusting position on the stand." Appx049(12:40-46). This sensor "is operatively connected to the controller for inhibiting a weight adjustment operation" unless it reports to the controller that the dumbbell is properly positioned. Appx049(12:42-46). Claim 8 requires "a device configured to grip the selectorized dumbbell for retaining" it in the proper "position on the stand during a weight adjustment operation," and claims 9–11 require that this gripping device include specific "fingers" that are "movably supported on the stand" (claim 9), that are "pivotal relative" to the stand's upper support surface

(claim 10), and that "project through slots in the upper support surface (claim 11). Appx049-050(12:47-13:5).

Finally, all the claimed systems enable simultaneous weight adjustment, and claims 12–14 recite a specific system that provides that functionality. Claim 12 recites the system of claim 1, which further includes "a plurality of selectorized dumbbells" and "a single electric motor [that] is operatively connected to the selectors of the plurality of dumbbells . . . such that only one motor adjusts the selectors of both dumbbells substantially simultaneously." Appx050(13:6-12). Claims 13 and 14 add further details to this system, such as a stand-mounted motor, "a plurality of rotatable drivers," "a belt and pulley system," and a particular configuration of those components. Appx050(13:13-34).

## III. THE DISTRICT COURT'S MOTION TO DISMISS RULING

PowerBlock filed its complaint on October 5, 2022, alleging that iFIT had infringed "one or more claims" of the '771 Patent and violated the Utah Unfair Competition Act based on its bad-faith patent infringement. Appx053. The complaint included a claim chart showing iFIT's infringement of claim 20, consistent with the District of Utah Local Patent Rules, which do not require patentees to identify every infringed claim until later in discovery. Appx094-097.

iFIT moved to dismiss the complaint on December 16, 2022, arguing that the '771 Patent's claims are directed to ineligible subject matter under § 101. Appx125-

142. iFIT's motion focused on claim 20 without contending that it was representative and addressed the remaining claims only in a footnote. Appx135-136(n.4).

The district court granted iFIT's motion to dismiss as to claims 1–18 and 20. Appx019. The court began by focusing on this Court's case law concerning automation. Appx006-007. It created a new, *per se* eligibility requirement for inventions that automate manual activities by inserting the word "must" before this Court's language from *EcoServices, LLC v. Certified Aviation Services, LLC*, 830 F. App'x 634 (Fed. Cir. 2020): "Where patent claims are directed toward automating previously manual activities, the claims at issue *must* 'achieve a level of automation that provides an improvement over the prior art . . . .'" Appx006(emphasis added; quoting *EcoServices*, 830 F. App'x at 642).

The district court next addressed representativeness. Despite iFIT's failure to make any showing as to claim 20's representativeness, the court treated that claim as representative of claims 1–18. Appx008-009. The court concluded, however, that because claim 19 is written in means-plus-function format, claim 20 is not representative of it. Appx009-010.

Under *Alice* Step One, the court concluded that claims 1–18 and 20 are directed to a patent-ineligible abstract idea, focusing on claim 20. Rather than assessing whether claim 20 as a whole is directed to an abstract idea, however, the district court improperly centered its analysis on the claim's breadth, repeatedly

characterized the claim as *involving* automated weight adjustment, and ignored most of the claim language. Appx011-012.

The district court applied these conclusions to claims 1–18 and likewise deemed them directed to ineligible subject matter. The court found that dependent claims 2-18 were abstract "because claim 1 is directed to an abstract idea and implemented using generic components requiring performance of the same basic process . . . ." Appx013. The court only briefly addressed claims 3–6 and omitted any specific discussion of claims 7–18. Appx013.

The district court denied the motion as to claim 19, which is written in means-plus-function format, "because [iFIT] failed to sufficiently distinguish claim 19 from claim 20, which it asserted was representative of the whole patent." Appx016. But tellingly, in a footnote, the court expressed "doubt" that even means-plus-function claim 19 would pass muster under § 101. Appx016(n.8).

Under *Alice* Step Two, the district court incorrectly concluded that claims 1–18 and 20 each lack an inventive concept, but in so concluding, it also made improper factual findings and relied on inapposite cases. Appx016-018. Specifically, the court found that the Claims at Issue "rest[] upon a straightforward assembly of generic machinery employed in their conventional use cases" based solely on attorney argument in iFIT's motion-to-dismiss brief. Appx017. Notably, in that brief, iFIT

expressly stated that it "disagrees with PowerBlock's assertion" in the '771 Patent. *Compare* Appx017(citing "Mot. at 3-5") *with* Appx132(n.2).

Finally, relying solely on cases concerning business or financial processes performed via general-purpose computers, the district court disregarded the advantages of the claimed invention as "generally conferred by the simple fact of automation and the removal of human operators rather than any benefit of the particular methods or processes identified in the patent." Appx018.

Based on this incorrect analysis and improper factual findings, the district court granted in part iFIT's motion to dismiss as to claims 1–18 and 20. The court denied the motion without prejudice as to means-plus-function claim 19, although it expressed doubt as to its eligibility, and to the claim under the Utah Unfair Competition Act. Appx019-020.

After the Parties stipulated to dismissal of the remaining claims, PowerBlock timely appealed. Appx026, Appx282.

## SUMMARY OF THE ARGUMENT

The district court committed two reversible errors: incorrectly concluding that the Claims at Issue are abstract under *Alice* Step One; and incorrectly finding that the Claims at Issue lack an inventive concept under *Alice* Step Two.

Under *Alice* Step One, the district court erroneously concluded that the Claims at Issue are directed to an abstract idea. The court failed to answer the correct

question—what are the claims as a whole directed to?—and improperly focused on whether the Claims at Issue *involve* an abstract idea.

But properly considering the Claims at Issue in their entireties in light of the ’771 Patent’s written description shows they are each directed to specific means made up of arrangements of specially configured components to solve technical problems with prior art selectorized dumbbells, and not to an abstract idea. Independent claims 1 and 20 both recite specific combinations of specially configured components that coordinate to motorize weight adjustment in a selectorized dumbbells. Dependent claims 2–18 add further specificity, including particular mechanical and safety components (*e.g.*, stand-mounted motors and gripping fingers) and particular arrangements of the overall system (*e.g.*, an arrangement that uses a single electric motor to simultaneously adjust multiple dumbbells’ weights using belts and pulleys).

The written description explains how the systems of the Claims at Issue provide technical improvements over prior art selectorized dumbbells. First, the claimed systems improve safety by (i) motorizing the weight adjustment process to reduce the risk of weights detaching during use due to user error; (ii) eliminating the selector tether that could catch and dislodge the selector during operation; and (iii) adding specially configured sensors and gripping devices. Second, the claimed

systems improve ease of use and operation by adding functionalities not found in prior art devices—remote weight adjustment and simultaneous weight adjustment.

This Court's § 101 case law confirms the Claims at Issue are patent eligible. Although this Court has seldom considered the eligibility of claims that recite mechanical components that coordinate to perform physical tasks, its decision in *EcoServices* supports eligibility. Like the patent-eligible claims in *EcoServices*, the Claims at Issue employ a "specific combination" of components configured to provide technical improvements over the prior art. 830 F. App'x at 643. Rather than using computers as tools to automate conventional activities or adding known features akin to ones previously deemed abstract, in both *EcoServices* and here, the claimed "system itself is new." *Id.* at 645.

By contrast, the cases on which the district court relied are inapposite. Each concerned claims that recited generic computers to collect, organize, or present data, which present unique eligibility problems. The Claims at Issue differ—they are directed to mechanical systems that perform mechanical processes to produce physical results. The district court's decision lies far outside of this Court's § 101 jurisprudence and should be reversed.

The district court's Step-One analysis contains four separate errors. First, the court improperly focused on the breadth of the Claims at Issue, an approach this Court has rejected, and incorrectly found that those claims would preempt all

systems for automated weight stacking, which is factually unsupported, contrary to law, and inconsistent with the pleadings. Second, the district court oversimplified the Claims at Issue by describing them at an overly high level of generality and reading out most of the claims' requirements. Third, the district court improperly treated claim 20 as representative, absent any proper basis for doing so, and relied on grounds that this Court has deemed inappropriate. Fourth, the district court improperly disregarded the technical advantages of the claimed systems as attributable solely to the removal of a human operator, but this is neither factually correct nor relevant for a mechanical invention.

Under *Alice* Step Two, the district court committed reversible error by finding the Claims at Issue lack an inventive concept. Contrary to the court's findings, the Claims at Issue recite numerous inventive concepts. As the '771 Patent describes, the overall systems of the independent claims consist of nonconventional combinations of specially configured components, and the dependent claims add further nonconventional mechanical components, safety features, and overall arrangements.

At the Rule 12(b)(6) stage, the district court was required to take the pleadings as true and construe factual inferences in PowerBlock's favor. It did not. Instead, the district court made numerous factual findings that the recited components are "generic," "routine," and "conventional" without identifying any support in the

pleadings and relying solely on iFIT's attorney argument. Moreover, iFIT's briefing raises a factual dispute that precluded dismissal.

Finally, in Step Two, the district court repeated the error from its Step-One analysis by improperly disregarding the claimed systems' technical benefits over the prior art. The court once again relied exclusively on inapposite cases concerning business or financial processes performed via generic computers.

For all the reasons set forth below, the district court's order granting iFIT's motion to dismiss and determining that the Claims at Issues are patent ineligible should be reversed.

## ARGUMENT

### I. Standard of Review

This Court reviews a grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) according to the law of the applicable regional circuit. *See CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1367 (Fed. Cir. 2020) (citation omitted). The Tenth Circuit reviews dismissals under Rule 12(b)(6) de novo. *See Straub v. Burlington N. Santa Fe Ry. Co.*, 909 F.3d 1280, 1287 (10th Cir. 2018) (citation omitted). During this de novo review, "all well-pleaded factual allegations" are accepted as true and viewed "in the light most favorable to the plaintiff." *Id.* (quotations and citations omitted).

District court conclusions regarding patent eligibility under 35 U.S.C. § 101 are likewise reviewed de novo. *CardioNet, LLC*, 955 F.3d at 1367 (citation omitted). Such conclusions are "question[s] of law that may contain underlying issues of fact." *Id.* (citations omitted). Facts pertaining to invalidity conclusions "must be proven by clear and convincing evidence." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368-69 (Fed. Cir. 2018) ("Whether something is well-understood, routine, and conventional to a skilled artisan at the time of the patent is a factual determination." (citation omitted)). Dismissal based on § 101 is improper at the Rule 12(b)(6) stage where there exist "factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018) (citations omitted). *See also Coop. Ent., Inc. v. Kollective Tech., Inc.*, 50 F.4th 127, 130 (Fed. Cir. 2022) (collecting cases); *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1318 (Fed. Cir. 2019) ("[F]actual disputes about whether an aspect of the claims is inventive may preclude dismissal at the pleadings stage under § 101").

## II. THE DISTRICT COURT ERRED IN CONCLUDING THAT THE CLAIMS AT ISSUE ARE DIRECTED TO EXCLUDED SUBJECT MATTER

The district court erred as a matter of law by incorrectly applying both steps of the *Alice Corp.* test for patent eligibility under § 101. The district court first failed to conduct a proper analysis under *Alice* Step One, which asks "whether the claims at issue are directed to" a patent-ineligible concept. *Alice Corp.*, 573 U.S. at 217.

This step does not "simply ask whether the claims *involve* a patent-ineligible concept, because essentially every routinely patent-eligible claim involving physical products and actions *involves* a law of nature and/or natural phenomenon—after all, they take place in the physical world." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016) (emphasis in original).

This Court has framed the Step One question as "whether the claims 'focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea.'" *CardioNet*, 955 F.3d at 1368 (quoting *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016)). Answering this question requires considering the claims "in their entirety to ascertain whether their character as a whole is directed to excluded subject matter." *McRO, Inc.*, 837 F.3d at 1312. Answering this question also requires "consider[ing] the patent's written description, as it informs [the] understanding of the claims." *CardioNet*, 955 F.3d at 1368.

Here, the district court answered the wrong question in the wrong way. Contrary to this Court's guidance, the district court assessed whether the Claims at Issue "involve" an abstract idea without considering whether they are directed to one. Further, the district court failed to consider the claims "in their entirety" and ignored the specification. As discussed below, considering the Claims at Issue in their entirety, in view of the '771 Patent's written description, shows they are each

directed to specific means consisting of specially configured components that solve technical problems with prior art selectorized dumbbells. They are not abstract.

### A. The Claims at Issue Are Directed to Specific Means That Solve Problems with Prior Art Selectorized Dumbbell Systems—Not to an Abstract Idea

#### 1. The Claims at Issue each recite specific systems

Each of the Claims at Issue is directed to a specific "weight selection and adjustment system" that improves upon prior art selectorized dumbbells. These systems constitute "specific means" for improving selectorized dumbbell technology. *See CardioNet*, 955 F.3d at 1368 (claims that "focus[ed] on a specific means or method that improves' cardiac monitoring technology" were not abstract).

The independent Claims at Issue both recite specific "weight selection and adjustment systems" that employ specially configured components to motorize weight adjustment. Appx049(11:54-67, 12:1-10), Appx050(14:33-47). Claim 20 adds two, specially configured components, neither of which were found in prior art devices, to a dumbbell for which weight "is adjust[ed] by coupling more or fewer weight plates to each end of the handle":

- "an electric motor that may be selectively energized" and is configured to "cause a desired number of weight plates to be coupled to each end of the handle" when it is energized; and

- "a data entry device [configured] to allow the user to input a weight selection decision that operatively controls the energization of the motor to adjust the exercise weight of the dumbbell" according to the "weight selection decision input . . . by the user."

Appx050(14:33-47).

Claim 1 includes specific requirements for the "selectorized dumbbell" and "electric motor" limitations. Appx049(11:54-67, 12:1-10). Its "selectorized dumbbell" includes "a movable selector having a plurality of different adjustment positions," with the selector "configured to couple selected numbers" of left and right weight plates to their respective ends of the dumbbell's handle "depending upon the adjustment position in which the selector is disposed . . . ." Appx049(11:54-67, 12:1). Its "electric motor" is "operatively connected to the selector" and configured to "physically move[] the selector" into the appropriate adjustment position "when energized from a source of electric power . . . ." Appx049(12:4-10).

The dependent Claims at Issue also are directed to "specific means" that provide technical improvements over prior art selectorized dumbbells because they recite further specific elements for motorizing weight adjustment. Several dependent claims add specific structural limitations absent from prior art devices:

- **claim 2**: a data entry device and controller, Appx049(12:11-19);

- **claim 5**: a stand for supporting the selectorized dumbbell during weight adjustment that includes a mounted motor and a driver releasably connected to the selector, Appx049(12:29-37); and
- **claim 15**: a driver releasably connected to the dumbbell's selector when it is positioned on the stand, Appx050(13:35-42).

Other dependent claims add specialized safety features:

- **claim 7**: a sensor that detects the dumbbell's position and inhibits weight adjustment if the dumbbell is incorrectly positioned for adjustment, Appx049(12:40-46); and
- **claims 8–11**: gripping devices, some of which include "fingers," that retain the dumbbell in the proper position for weight adjustment, Appx049-050(12:47-13:5).

And two sets of dependent claims require specific arrangements of the overall system. **Claims 12–14** are directed to systems that use a single electric motor to simultaneously adjust the weights coupled to two or more dumbbells. Appx050(13:6-34). Conversely, **claims 16–18** are directed to self-contained systems having all weight selection and adjustment components mounted on the dumbbell's handle. Appx049-050(12:43-13:11).

Because the Claims at Issue all recite "specific means" for motorizing weight adjustment in a manner not available in prior art selectorized dumbbells, they are not

directed to an abstract idea. *See CardioNet*, 955 F.3d at 1368; *EcoServices*, 830 F. App'x at 643 (claims directed to "specific combination" of components "configured in a certain way to create technical improvements" over prior art were not abstract).

#### 2. The systems of the Claims at Issue each solve technical problems with prior art selectorized dumbbells

The technical advantages described in the '771 Patent's written description confirm that the Claims at Issue are not abstract. *See CardioNet*, 955 F.3d at 1368-69 (stating that the written description's explanation of the claimed invention's advantages "confirm[ed] our conclusion" that the claims were not directed to an abstract idea); *Enfish*, 822 F.3d at 1337 ("[O]ur conclusion that the claims are directed to an improvement of an existing technology is bolstered by the specification's teachings that the claimed invention achieves other benefits over conventional databases . . . ."). "[I]nventions with specific applications or improvements to technologies in the marketplace are not likely to be so abstract that they override the statutory language and framework of the Patent Act." *Rsch. Corp. Techs., Inc. v. Microsoft Corp.*, 627 F.3d 859, 869 (Fed. Cir. 2010). When "the focus of the claim is a specific and concrete technological advance, for example an improvement to a technological process or in the underlying operation of a machine, [the] inquiry ends and the claim is eligible." *ADASA Inc. v. Avery Dennison Corp.*, 55 F.4th 900, 908 (Fed. Cir. 2022) (collecting cases).

This is exactly the case here. First, the claimed systems enhance safety over prior art dumbbells through several technical improvements. The Claims at Issue eliminate hand-manipulated "mechanical members" that could be incorrectly or incompletely engaged, causing weights to detach during use, by combining specially configured components to motorize weight adjustment. Appx044(1:49-54), Appx047(7:36-40). The Claims at Issue also eliminate prior art devices' external tether cords, which can catch during use, causing the selector to dislodge and the weights to detach. Appx048(10:48-51). And dependent claims 7–11 add specific, nonconventional safety elements—specially configured sensors and gripping devices that hold the dumbbells in place for weight adjustment operations and inhibit weight adjustment when the dumbbells are improperly positioned. Appx049(11:27-37).

Second, the claimed systems improve ease of use over prior art selectorized dumbbells by introducing new functionalities not found in prior art devices. First, the claimed systems enable remote weight adjustment through the cooperation of the data entry device and the specially configured electric motor, which saves the user from directly gripping and manipulating the manual selectors. Second, the claimed systems enable the simultaneous adjustment of the weights of both dumbbells, with claims 12–14 specifically requiring the use of a "single motor" for such simultaneous operations.

Consequently, the Claims at Issue are each directed to "a specific and concrete technological advance" and not to excluded subject matter. *ADASA Inc.*, 55 F.4th at 908. As in *ADASA*, "[the] inquiry [therefore] ends[,] and the claim is eligible." *Id.* (collecting cases).

### B. Considering the Claims at Issue in the Context of This Court's § 101 Case Law Confirms They Are Patent-Eligible

#### 1. The Court's *EcoServices* decision confirms that the Claims at Issue are not abstract

Assessing the Claims at Issue through the lens of this Court's § 101 case law confirms they are directed to specific means for solving problems with prior art selectorized dumbbells and not to excluded subject matter. Under *Alice* Step One, this Court has often compared the claims in question to those previously adjudged eligible or ineligible. *See, e.g.*, *CardioNet*, 955 F.3d at 1369 (concluding that claims at issue were "akin to claims we have previously . . . [adjudged to be] directed to technological improvements"); *Enfish*, 822 F.3d at 1334 ("[B]oth this [C]ourt and the Supreme Court have found it sufficient to compare claims at issue to those claims already found to be directed to an abstract idea in previous cases.").

Such a comparison is difficult in this case—almost none of this Court's prior decisions concerned claims to a mechanical invention used to perform physical tasks, such as the claimed weight adjustment systems. In fact, the district court acknowledged this by noting "that the gravamen of the Federal Circuit case law

regarding automation under *Alice* Step One relates to data-processing and similar computational processes . . . .” Appx007. That is because these patent ineligible claims are typically directed to a generic computer that either performs essentially mental processes or manipulates, transmits, or presents data—and not to a new, physical machine.

But the Court’s decision in *EcoServices* is illuminating. That case concerned claims to “[a] system for washing turbine engines” comprising “a washing unit for providing a washing liquid to the turbine engines”; “an information detector configured to gather information related to engine type”; and “a control unit configured to accept” the engine type information, “to determine a washing program” as a function of that information from a set of programmed washing programs, and “to regulate the washing unit according to” the program’s parameters. 830 F. App’x at 636. The accused infringer argued that the claims were “directed to the abstract idea of using a generic computer to automate the conventional washing process traditionally performed by human operators,” *id.* at 641, and that using computer components such as an “information unit” to improve upon “human-operated engine washing” rendered the claims abstract, *id.* at 643.

The Court rejected these arguments and concluded that the claims were “directed to a specific combination of a type of washing unit, information detector, and control unit, configured in a certain way to create technical improvements to

systems for washing jet engines." *Id.* It explained that the claims did not present "the situation where there was a pre-existing system being used to which only a known feature, similar to features previously determined to be abstract, was added." *Id.* at 645 (distinguishing *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759 (Fed. Cir. 2019), and *Chamberlain Grp. v. Techtronic Indus. Co.*, 935 F.3d 1341 (Fed. Cir. 2019)). Instead, "the system itself [wa]s new." *Id.* The Court also relied on the patent's description of invention's advantages: "a higher degree of quality of an engine washing procedure, a minimized risk of wrongly operated equipment, a higher degree of safety, and cost efficiency and reliability." *Id.* at 642 (cleaned up).

The Court's reasoning in *EcoServices* applies equally to the Claims at Issue. As in *EcoServices*, the Claims at Issue are directed to "specific combination[s]" of components, configured in certain ways to create technical improvements to selectorized dumbbells. The system of claim 20 combines a dumbbell with a selectively energized electric motor and a data entry device configured so the user can input a weight selection decision that operatively controls the energization of the motor. Appx050(14:33-47). The system of claim 1 combines a specific selectorized dumbbell having a movable selector, moved into weight adjustment position corresponding to the selected exercise weight by an operatively connected electric motor. Appx049(11:54-67, 12:1-10). To that system, the dependent claims add requirements such as a stand-mounted motor, a releasably connected driver,

specially configured sensors, and gripping devices configured to hold the dumbbells in place, including devices using fingers in different arrangements. Appx049-050. And other dependent claims require multiple-dumbbell/single-motor configurations, as well as self-contained dumbbell configurations featuring all components, including the motor, mounted to the dumbbell handle. Appx050.

As in *EcoServices*, these claimed systems do not simply "use a computer as a tool to automate conventional activity" *EcoServices*, 830 F. App'x at 643 (quoting *McRO*, 837 F.3d at 1314), nor do they add "a known feature, similar to features previously determined to be abstract," to a "pre-existing system." *Id.* at 645. *See also McRO*, 837 F.3d at 1314 (concluding that the claimed automation systems were not abstract where they went "beyond merely 'organizing [existing] information into a new form' or carrying out a fundamental economic practice") (citations omitted). Indeed, none of the elements of the '771 Patent's claimed systems resemble features that this Court has deemed abstract. *Cf.*, *ChargePoint, Inc.*, 920 F.3d at 767–68 (networked communication among charging stations deemed abstract); *Chamberlain Grp.*, 935 F.3d at 1346–47 (observing that the claimed invention, "[w]irelessly communicating status information about a system[,] [wa]s similar to abstract ideas we have found in our previous cases"). Rather, like *EcoServices*, the claimed mechanical systems are themselves new.

Further, the benefits achieved by the ’771 Patent’s claimed systems mirror those recognized by the Court in *EcoServices*. Those benefits include “minimiz[ing] the risk of wrongly operated equipment,” such as when a user incorrectly or incompletely engaging the selector, and “a higher degree of safety.” *EcoServices*, 830 F. App’x at 642; Appx044(1:49-51).

Indeed, the Claims at Issue are even more concrete than those in *EcoServices* because they add specific functionalities, such as motorized remote and simultaneous weight adjustment. These functionalities improve upon the prior art weight adjustment process irrespective of the removal of human operators. *Cf.*, *EcoServices*, 830 F. App’x at 657 (Dyk, J., dissenting) (noting that the asserted patent did not claim “an improvement of the washing process other than having a computer enter the established washing parameters instead of a human”).

#### 2. The district court relied on inapposite cases involving the claimed use of a computer to automate a mental process

In performing its Step One inquiry, the district court leaned on cases concerning “data-processing and similar computational processes,” Appx007; *see also* Appx011, Appx013(n.5), but those cases are inapposite. Each of the cases on which the district court’s Step One analysis relied dealt with using general-purpose computers and generic computer components to collect, organize, or present data. *See Univ. of Fla. Rsch. Found., Inc. v. Gen. Elec. Co.*, 916 F.3d 1363, 1366–68 (Fed. Cir. 2019) (concerning claims directed to collecting, analyzing, manipulating, and

displaying patient data from beside machines performed using a general-purpose computer); *Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1054–55 (Fed. Cir. 2017) (concerning claims directed to processing a credit application comprising obtaining data from different databases, combining the data, and presenting the combined data); *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607 (Fed. Cir. 2016) (concerning claims directed to classifying and storing an image based on its classification using a generic telephone and server); *Ficep Corp. v. Peddinghaus Corp.*, No. 2022-1590, 2023 WL 5346043 (Fed. Cir. Aug. 21, 2023) (concerning claims directed to using generic computer to extract and transfer CAD data from a CAD design model).

The district court erred by analogizing the '771 Patent to these "quintessential 'do it on a computer' patent[s]." *Ficep Corp.*, 2023 WL 5346043, at *4 (quoting *Univ. of Fla.*, 916 F.3d at 1367). This Court has explained why computer technology in particular can pose problems under § 101—the intended use of a computer is to perform mental processes faster than humans can. *See Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Can. (U.S.)*, 687 F.3d 1266, 1277–78 (Fed. Cir. 2012) (stating that "a 'computer' is 'an automatic electronic device for performing mathematical or logical operations[,]' . . . . [and] prior to the information age, a 'computer' was not a machine at all; rather, it was a job title: 'a person employed to make calculations.'") (citations omitted). This "interchangeability of certain mental

processes and basic digital computation . . . help[s] explain why the use of a computer in an otherwise patent ineligible process for no more than its most basic function—making calculations or computations—fails to circumvent the prohibition against patenting abstract ideas and mental processes." *Id. See also Ficep*, 2023 WL 5346043, at *4 ("[C]alculat[ing] intersection parameters from other data contained in the design model . . . encompasse[d] an abstract idea because it can be performed *by the human mind or a human using a pen and paper.*" (emphasis added)).

Not so here. The Claims at Issue are not directed to "mental processes," nor do they encompass tasks that "can be performed by the human mind or a human using a pen and paper." They do not "fit into the familiar class of claims that 'focus on' certain independently abstract ideas that use computers as tools." *CardioNet*, 955 F.3d at 1371 (citations omitted); *see also Enfish*, 822 F.3d at 1339 ("[W]e are not faced with a situation where general-purpose computer components are added post-hoc to a fundamental economic practice or mathematical equation."). Rather, the Claims at Issue are directed to mechanical processes performed via specific combinations of mechanical components which produce physical, tangible results.

Affirming the district court's decision would therefore yield an outlier in § 101 jurisprudence. Neither this Court nor the Supreme Court have ever concluded that claims like the Claims at Issue are directed to an abstract idea. The district court's decision must be reversed.

### C. The District Court Committed Four Errors in Its *Alice* Step One Analysis

Separate from its incorrect application of the applicable § 101 case law, the district court committed at least four reversible errors in its *Alice* Step One analysis: (1) improperly focusing on the breadth of the claims, rather than on their character as a whole; (2) oversimplifying the claims; (3) improperly treating claim 20 as representative and conducting conclusory analysis of the other Claims at Issue; and (4) inappropriately disregarding the claimed invention's advantages over the prior art. These errors are discussed below.

#### 1. The district court erred by focusing on the breadth of claim 20 rather than what the claims are "directed to"

First, the district court erred in its Step One analysis by focusing not on what the Claims at Issue are "directed to," but on their breadth. For example, in rejecting claim 20 as ineligible, the court stated that it "would seem to cover all or substantially all systems for automated dumbbell plate stacking involving electric motors and data entry systems and is therefore overly broad." Appx012.

But the test is not whether the claim is broad. Rather, under *Alice* Step One, "courts must consider 'the focus of the claim, i.e., its character as a whole, in order to determine whether the claim is directed to an abstract idea.'" *Ioengine, LLC v. Paypal Holdings, Inc.*, 607 F. Supp. 3d 464, 484 (D. Del. 2022) (Bryson, J., sitting by designation) (citation omitted). As Judge Bryson has explained, "the breadth of

the claims does not necessarily dictate whether the invention is directed to patent-eligible subject matter." *Id.*

This Court's decision in *McRO* is instructive. There, the patent pertained to animating facial expressions during speech. The claimed invention used rules, rather than artists' subjective impressions, to set the morph weights and transitions between phonemes. In the district court's view, "because the claims were not limited to specific rules, but rather 'purport to cover all such rules,' the claims merely call for application of the abstract idea of using rules." *McRO*, 837 F.3d at 1309 (citations omitted). The court rejected the claims as unpatentable "because 'the novel portions of [the] invention [we]re claimed too broadly." *Id.* (citation omitted).

In reversing, this Court characterized the claimed "rules" as a "genus." *Id.* at 1313. While necessarily broader than species claims, the Court noted that genus claims "have long been acknowledged as patentable." *Id.* Critically, the Court explained that assessing the patentability of the "broad claim scope" inherent in genus claims falls under the written description requirement of § 112, not "the abstract idea exception to § 101." *Id.* at 1313–14.

Here, the district court rejected claim 20 (and by extension, the other Claims at Issue) as broadly claiming a "system[] for automated dumbbell plate stacking involving electric motors and data entry systems." Appx012. But this conclusion erroneously equates a broad claim with an abstract one and fails to address the

claim's "character as a whole." The district court never even identified claim 20's purported abstract idea. And similar to rejecting claims that purportedly "cover all rules," *McRO*, 837 F.3d at 1313, the district court deemed claim 20 "insufficiently specific" because it read the claim as requiring "any electric motor," Appx012.[1] Nothing in this Court's or the Supreme Court's § 101 decisions, however, would require limiting claims to a particular type of electric motor to achieve patentability.

At the heart of the district court's ineligibility holding is its finding that the Claims at Issue would preempt all means "for accomplishing automated dumbbell weight stacking," Appx012, but the narrow focus of the '771 Patent's claimed invention is hardly a "basic tool[] of scientific [or] technological work." *Alice Corp.*, 573 U.S. at 216. Regardless, the district court's preemption finding lacks factual and legal support. The court's Memorandum Order identifies nothing to substantiate its finding that claim 20 "outlines only the conceivably necessary components for any automated weight-stacking mechanism." Appx011. But this is tantamount to an obviousness analysis and misses the very point of the patent system—to encourage others to conceive of and reduce to practice *new* inventions. That the district court, on a limited record, could not itself conceive of alternatives is irrelevant.

[1] In a footnote, the district court noted the '771 Patent's broad definition of "motor" in the specification, suggesting that the court interpreted "electric motor" even more broadly than the claim language would require.

Moreover, the pleadings contradict the district court's findings. Although claim 20 requires a "data entry device," claim 1 does not, implying that other means for inputting weight (for example, an array of switches) are available. Appx049(claim 1). Similarly, each of the Claims at Issue requires an "electric motor," but the '771 Patent explains that other types of motors exist. Appx049(11:43-47) (defining "motor" as including "any powered device that converts electrical energy into physical motion, e.g. a solenoid, a magnet, etc."). The district court cited no case that would require a patent to disclose each type of available component and limit the claims to a subset to achieve patentability, and *McRO* says otherwise. *See* 837 F.3d at 1315 ("Defendants again rely only on the patents' description of one type of rules, but the description of one set of rules does not mean that there exists only one set of rules, and does not support the view that other possible types of rules with different characteristics do not exist.").

Moreover, the district court's preemption findings fail to account for the '771 Patent's dependent claims. Those claims narrowly require specific technical components, such as a stand-mounted motor, a driver releasably connected to the selector, specially configured sensors, various gripping devices, and the multiple-dumbbell-single motor and self-contained systems of claims 12–14 and 15–18, respectively. These narrower claims cannot conceivably preempt all automated

dumbbell weight stacking." The district court's reliance on preemption was therefore both misguided and incorrect, constituting reversible error.

#### 2. The district court erred by oversimplifying the claims by looking at them generally and reading out claim limitations

The district court compounded its improper focus on claim breadth by committing an error that this Court has repeatedly warned against: "'oversimplifying the claims' by looking at them generally and failing to account for the specific requirements of the claims." *CardioNet*, 955 F.3d at 1371 (quoting *McRO*, 837 F.3d at 1313). The district court characterized the Claims at Issue as concerning "automated weight-stacking," "automated dumbbell weight stacking," and "automated dumbbell weight stacking involving electric motors and data entry systems." Appx011-012. But "describing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule." *Enfish*, 822 F.3d at 1337. The district court's description of the Claims at Issue at such a high level of generality is akin to the error in *CardioNet*, in which the district court had mischaracterized claims to an improved cardiac monitoring device as "being directed to collecting, analyzing, and reporting data." 955 F.3d at 1371. *See also Enfish*, 822 F.3d at 1337–38 ("In finding that the claims were directed simply to 'the concept of organizing information using tabular formats,'. . . the district court oversimplified the self-referential component of the claims and downplayed the invention's benefits.") (internal citation omitted).

The district court also failed to account for the "specific requirements" of the Claims at Issue. *CardioNet*, 955 F.3d at 1371 (quoting *McRO*, 837 F.3d at 1313). For example, the court effectively rewrote claim 20 to eliminate almost all of the specific limitations:

| **Actual Language of Claim 20** | **The District Court's Oversimplified Rewriting of Claim 20** |
|---|---|
| "a dumbbell that provides an exercise weight that is lifted by a user when the user grips and lifts a handle of the dumbbell, wherein the exercise weight provided by the dumbbell is adjustable by coupling more or fewer weight plates to each end of the handle" | "a dumbbell ~~that provides an exercise weight that is~~ [which can be] lifted ~~by a user when the user grips and lifts a handle of the dumbbell, wherein~~ the ~~exercise~~ weight [of which] ~~provided by the dumbbell~~ is adjustable ~~by coupling more or fewer weight plates to each end of the handle~~" |
| "an electric motor that may be selectively energized and when energized will cause a desired number of weight plates to be coupled to each end of the handle" | "an electric motor ~~that may be selectively energized and when energized~~ [which] will cause a desired number of weight plates to be coupled ~~to each end of the handle~~" |
| "a data entry device to allow the user to input a weight selection decision that operatively controls the energization of the motor to adjust the exercise weight of the dumbbell in accordance with the weight selection decision input into the data entry device by the user" | "a data entry device to allow the user to ~~input a weight selection decision that operatively~~ control~~s the energization of~~ the motor ~~to adjust the exercise weight of the dumbbell in accordance with the weight selection decision input into the data entry device by the user~~" |

*Compare* Appx050(14:33-47) (claim 20) *with* Appx011.

By oversimplifying claim 20 as consisting of three basic components that perform basic functions, the district court committed the same error in *McRO*. There,

the claims recited a "method for automatically animating lip synchronization and facial expression of three-dimensional characters" that used "a first set of rules that define output morph weight set stream as a function of phoneme sequence and time of said phoneme sequence" to animate lip and facial movements. *McRO*, 837 F.3d at 1307–08. The district court found that "the claims improperly purport to cover all rules" used in lip-synchronized three-dimensional computer animation. *Id.* at 1313. This Court rejected this oversimplification, explaining that the claims focused on "a specific asserted improvement in computer animation, i.e., the automatic use of rules of a particular type." *Id.* at 1314.

Likewise, here, the Claims at Issue focus on specific improvements in selectorized dumbbell technology that use specific components coordinating to adjust weight in a particular manner, enabling new functionalities such as remote and simultaneous weight adjustment. In the system of claim 20, a user inputs a desired weight using a "data entry device," and this "weight selection decision . . . operatively controls the energization" of a "selectively energized" "electric motor" to "cause a desired number of weight plates to be coupled to each end" of the "handle of the dumbbell." Appx050(14:40-47). In the system of claim 1, a "selectorized dumbbell" includes a "movable selector . . . configured to couple selected numbers of left weight plates to the left end of the handle and selected numbers of right weight plates to the right end of the handle," and weight is adjusted via an "electric motor

[that] physically moves the selector into the adjustment position corresponding to the desired exercise weight" selected by the user. Appx049(11:54-12:10). Thus, like the "rules" in *McRO*, the "dumbbell[s]," "electric motor[s]," and "data entry system[s]" recited in the Claims at Issue have "specific characteristics." *McRO*, 837 F.3d at 1313. The district court erred by ignoring them.

The district court's oversimplification error is even more pronounced for claims 2–18. Its complete description of the limitations added by those claims is: "buttons (dependent claim 3), a visual display (dependent claim 4), a stand (dependent claims 5 and 6), and so on . . . ." Appx013. This drastically oversimplifies claims 5 and 6, which both add numerous structural requirements, including a stand-mounted motor and data entry device and a driver releasably connected to the selector. And the court addressed neither the specific safety elements required by claims 7–11 nor the detailed system configurations required by claims 12–14 and 15–18, respectively.

Based on its erroneous oversimplification of the Claims at Issue, the district court distinguished *EcoServices* and analogized to *University of Florida*, but the court got it backwards. The *EcoServices* claim and the Claims at Issue similarly recite structural components (below, in blue), along with the functions those components perform and the way they perform them (below, in green):

| Patent Eligible *EcoServices* Claim | '771 Patent, Claim 20 |
|---|---|
| "an information detector configured to gather information related to engine type"<br><br>"a control unit configured to accept the information related to engine type from the information detector and to determine a washing program to be used as a function of the information relating to engine type from a set of preprogrammed washing programs, and further configured to regulate the washing unit according to washing parameters associated with the washing program used" | "an electric motor that may be selectively energized and when energized will cause a desired number of weight plates to be coupled to each end of the [dumbbell's] handle"<br><br>"a data entry device to allow the user to input a weight selection decision that operatively controls the energization of the motor to adjust the exercise weight of the dumbbell in accordance with the weight selection decision input into the data entry device by the user" |

*Compare EcoServices*, 830 F. App'x at 636 (claim 1) *with* Appx050(14:33-47) (claim 20).

By contrast, the claim at issue in *University of Florida* recites method steps without identifying either components or processes for performing those steps, such as "receiving physiological treatment data from at least two bedside machines" and "performing at least one programmatic action involving said machine-independent data." 916 F.3d at 1366. The only recited components are merely passive locations where data is obtained, steps occur, or results are displayed, such as "a computing device" "within" which "physiological treatment data" is "convert[ed]" from one format to another, and a "beside graphic user interface" on which "results from said programmatic actions" are "present[ed]." *Id.* The district court's comparisons of the

Claims at Issue to *EcoServices* and *University of Florida* thus were incorrect and fail to support its ineligibility findings.

By mischaracterizing the Claims at Issue at an improperly high level of generality, the district court oversimplified them and ignored specific claim limitations. The district court failed to consider the Claims at Issue as a whole, as it was required to do, requiring reversal. *See CardioNet*, 955 F.3d at 1371; *Enfish*, 822 F.3d at 1337–38.

#### 3. The district court erred by improperly treating claim 20 as representative of the Claims at Issue

The district court's conclusory analysis of claims 1–18 stemmed from its next reversible error: improperly treating claim 20 as representative of the other Claims at Issue. Although "[c]ourts may treat a claim as representative in certain situations, such as if the patentee does not present any meaningful argument for the distinctive significant of any claim limitations not found in the representative claim or if the parties agree to treat a claim as representative." *Berkheimer*, 881 F.3d at 1365. But neither of those situations occurred here. To the contrary, iFIT's motion to dismiss did not assert that claim 20 is representative of the other claims and addressed the other claims only in a footnote. Appx135-136(n.4). Further, PowerBlock disputed representativeness and pointed out numerous distinct limitations that distinguish the other Claims at Issue from claim 20. Appx170-173. The district court should have separately analyzed each of claims 1–18.

Yet it did not. Instead, the district court treated claim 20 as representative of claims 1–18 because PowerBlock's complaint had focused on that claim, Appx009, but nothing in this Court's cases support a finding of representativeness in these circumstances. To the contrary, in *Berkheimer*, the Court concluded that the patentee focusing its "primary arguments" on claim 1 did not justify treating that claim as representative. *See* 881 F.3d at 1365.

The district court's basis for representativeness is particularly inappropriate here. PowerBlock's Complaint alleged that iFIT infringes "one or more claims" of the '771 Patent. Appx059. And while the Complaint focused on claim 20, the applicable Local Patent Rules provide that a plaintiff need not specifically identify "each claim of each asserted patent that is allegedly infringed by the opposing party" at the pleading stage; the Local Patent Rules do not require this identification until well into discovery, after the defendant serves its initial patent disclosures. *See* D. Utah LPR 2.3(a). Because the applicable Local Patent Rules deferred PowerBlock's identification of each allegedly infringed claim until well into discovery, the district court erred by using the Complaint's focus on claim 20 as dispositive of representativeness.

Expanding on this error, the district court found the '771 Patent's dependent claims ineligible for the sole reason that had concluded that claim 1 was abstract (based largely on its analysis of claim 20). Appx013. Once again, *Berkheimer*

contradicts this approach; it states that "[a] claim is not representative simply because it is an independent claim." 881 F.3d at 1365. Here, as discussed above, the dependent claims recite patentable features and warranted independent analysis. *See supra* Argument, § II.A.1. The district court's conclusory finding of ineligibility based on their dependence from claim 1 thus was improper, requiring reversal of its dismissal order at least as to claims 1–18. *See Berkheimer*, 881 F.3d at 1370 (reversing summary judgment holding dependent claims 4–7 patent-ineligible under § 101).

#### 4. The district court erred by disregarding the claimed invention's advantages over the prior art

Finally, the district court erred by failing to properly consider the advantages of the claimed systems identified in the '771 Patent's written description. In a footnote, it disparaged them as "consist[ing] of little or nothing more than removing the possibility of human error" in a way that does not "come[] from any particular process or method identified in the patent claims." Appx013(n.5). But this is wrong. Contrary to the district court's conclusion, the claimed systems' advantages over the prior art are improvements to selectorized dumbbell technology and do not result merely from making a mental process faster, more efficient, or more accurate by performing it on a general-purpose computer.

First, the Claims at Issue specifically recite components and processes that achieve technical advantages such as remote weight adjustment and improved

safety. The recited electric motors, data entry devices, stand-mounted motors, and releasably connected drivers of claims 1, 2, 5, and 20, variously, are specifically configured to cooperate to provide remote weight adjustment, a functionality that prior art devices lacked. Further, the sensors and gripping devices of claims 7–11, respectively, each retain the selectorized dumbbell in the proper position during weight adjustment, making the overall system safer to use.

Second, the district court is wrong that advantages flowing from "removing the possibility of human error" cannot support patentability. As stated in *McRO*, "processes that automate tasks that humans are capable of performing are patent eligible if properly claimed[.]" 837 F.3d at 1313. In *EcoServices*, the accused infringer argued that the disclosed problem in the prior art was "human error in the conventional engine washing process" and the invention's solution was to "use a generic computer instead of a human operator." 830 F. App'x at 641, 643. The Court rejected this argument. It explained that although "human operators were washing aircraft engines before the patented invention[,] [t]hat the claimed system achieves automation of a task previously performed by humans . . . does not mean the claimed system is necessarily directed to an abstract idea." *Id.* at 643. That is true here.

The district court erred by failing to properly consider the technical advantages of the claimed systems described in the '771 Patent's specification. It was required to "construe all facts and draw all reasonable inferences in favor of

[PowerBlock], the non-moving party. Here, there is no record evidence undermining the many statements in the written description concerning the benefits of the claimed device." *CardioNet*, 955 F.3d at 1371. The district court's unsupported and incorrect disregard of the claimed systems' advantages warrants reversal.

## III. THE DISTRICT COURT ERRED BY MAKING IMPROPER FACTUAL FINDINGS UNDER *ALICE* STEP TWO

The district court also erred by concluding that the Claims at Issue lack an inventive concept under *Alice* Step Two, which provides that claims directed to ineligible subject matter are patentable if they contain an "inventive concept[.]" *Alice Corp.*, 573 U.S. at 217–18. Under Step Two, courts "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* (cleaned up). Patent claims contain an inventive concept when they "recite a specific, discrete implementation of the abstract idea" or when the patent discloses how the particular organization of the recited elements provides a technical improvement over the prior art. *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016). Even where individual claims elements were known in the art, "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *Id.*

### A. The Claims at Issue Recite Several Inventive Concepts

Here, the Claims at Issue recite both nonconventional components in the '771 Patent's field of invention and particular, nonconventional arrangements of those components. As discussed above, the claimed systems employ specific arrangements of components, including a specially configured electric motor and a data entry device, to cooperate to perform motorized weight adjustment. *See supra* Argument, § II.A.1. The claims also require highly specific implementations of the disclosed invention. Such implementations include the stand-based system of claim 5, requiring a stand-mounted motor and a driver releasably connected to the selector; the single-motor/multiple dumbbell system of claims 12–14; and the system of claims 15–18 in which the dumbbell itself includes all weight adjustment components. Appx049-050. Such implementations also include those with specifically configured sensors and gripping devices, as recited in claims 7–11. Appx049-050.

As the '771 Patent describes, both these arrangements and the components themselves were nonconventional in the field of selectorized dumbbell technology. The patent notes that, as the time of the invention, "no similar data entry device has been used to adjust the numbers of weights coupled to each end of the handle of a selectorized dumbbell." Appx044(2:1-8). The '771 Patent further explains that there was "a need in the art to automate and ease the task of adjusting the weight of

selectorized dumbbells" due to the safety and ease-of-use issues discussed above. Appx044(1:38-51, 1:64-67, 2:6-10). And the patent highlights the advantageous safety features, including the sensors and interlock fingers that retain the dumbbell in place during a weight adjustment operation. Appx047(7:42-54, 7:59-62; 8:13-16).

### B. The District Court Based Its Step Two Analysis on Inappropriate, Unsupported Factual Findings at the Pleadings Stage

At the motion to dismiss stage, the district court was required to take as true the pleadings' factual allegations, including those found in the '771 Patent itself. *See Coop. Ent.*, 50 F.4th at 130 (collecting cases; reversing Rule 12(b)(6) dismissal based on § 101). This requirement is particularly critical under *Alice* Step Two; as this Court has explained, "[w]hether the claim elements or the claimed combination are well-understood, routine, conventional is a question of fact." *Aatrix*, 882 F.3d at 1128; *see also Berkheimer*, 881 F.3d at 1368–69 ("Whether something is well-understood, routine, and conventional to a skilled artisan at the time of the patent is a factual determination."). But the district court ignored this requirement and made numerous factual findings while failing to draw all factual inferences in PowerBlock's favor. Appx016-019. *See Straub*, 909 F.3d at 1287 (under Rule 12(b)(6), "all well-pleaded factual allegations" are accepted as true and viewed "in the light most favorable to the plaintiff") (citation omitted). Not only do the pleadings fail to support the district court's Step Two fact findings—they contradict them.

Undergirding the district court's conclusion that the Claims at Issue lack an inventive concept are its repeated findings that the recited elements are "generic," "routine," and "used conventionally." Appx017-018. But these factual findings lack any support in the pleadings. Not once did the district court cite the '771 Patent or anything else in the pleadings in the Step Two portion of its opinion. *See generally* Appx016-019.

The only support the district court provided identified for its Step-Two fact findings was iFIT's motion to dismiss brief—bald attorney argument. Appx017(citing "Mot. at 3-5"). In conflict with the '771 Patent's statement in the written description that prior art selectorized dumbbells had not used any "similar data entry device" to adjust the weights of selectorized dumbbells, the district court adopted iFIT's unsupported attorney argument disputing this: "As Defendant notes, the '771 patent itself acknowledges that *both* selectorized dumbbells generally *and* data-entry devices such as the one at issue in claim 20 were well-known at the time of the '771 patent's issuance." Appx017(citing "Mot. at 3-5"). But unsupported attorney argument cannot support a Rule 12(b)(6) dismissal based on asserted ineligibility. *See McRO*, 837 F.3d at 1315 (rejecting attorney argument that any "rules-based lip-synchronization process must use the claimed type of rules" because "no record evidence supports this conclusion").

Indeed, while the ’771 Patent recognizes that data entry devices were known in consumer electronics products, it explicitly states they have never been used in a selectorized dumbbell. Appx044(2:4-8), Appx049(11:16-19). Thus, per the pleadings, such devices were not “conventional” or “routine” in dumbbell weight adjustment—their use was novel and inventive. By finding without support in the pleadings that the recited components are “generic,” “routine,” and “used conventionally,” the district court committed reversible error. *See Aatrix*, 882 F.3d at 1129 (vacating Rule 12(b)(6) dismissal because “[t]he district court supplied no reasoning or evidence for its finding that the claimed data file ‘describe[d] a ‘well understood’ and ‘routine’ component and function of a computer, . . . nor [wa]s there any in the record” at the pleading stage) (citation omitted).

The district court’s reliance on iFIT’s brief reveals a factual dispute that should have precluded dismissal. *See id.*, 882 F.3d at 1126–27 (concluding that the pleading “survive[d] an *Alice/Mayo* analysis at the Rule 12(b)(6) stage” due to the presence of “factual disputes underlying the § 101 analysis”). The portion of iFIT’s brief on which the district court relied expressly states that iFIT “disagrees with PowerBlock’s assertion” in the ’771 Patent as to the absence of data entry devices from the field of invention. Appx132(n.4). iFIT’s disagreement with unambiguous statements in the ’771 Patent’s written description should have prevented the district court’s Rule 12(b)(6) dismissal. *See Aatrix*, 882 F.3d at 1126–27.

### C. The District Court Disregarded the Claimed Systems' Advantages by Relying on Inapposite Cases Concerning Generic Computers

Finally, as it did under Step One, the district court improperly disregarded the benefits achieved by the systems of the Claims at Issue. It disparaged those benefits as "conferred by the simple fact of automation and the removal of human operators," but as explained above, this is neither factually nor legally correct. *See supra* Statement of the Case, § III; Argument, § II.

Once again, the district court relied exclusively on cases concerning claims to inventions concerning business or financial processes implemented using a general-purpose computer. Appx018(citing *Intellectual Ventures I LLC v. Capital One Bank (USA),* 792 F.3d 1363, 1367 (Fed. Cir. 2015) (concerning computer-implemented budgeting); *OIP Techs., Inc. v. Amazon.com, Inc.,* 788 F.3d 1359, 1363 (Fed. Cir. 2015) (concerning computer-implemented price optimization); *Bancorp Servs.*, 687 F.3d at 1278 (concerning computer-implemented administering and tracking of life insurance policies)). The court reasoned that "making existing processes more quick or accurate by means of a computer . . ." does not satisfy Step Two. Appx018.

But as explained above, that rationale does not apply to the Claims at Issue, which recite specific mechanical systems that accomplish physical tasks in ways that differ from the prior art and are safer and easier to use. *See*, *e.g., supra* Argument, § II.A.2. Under the district court's reasoning, patent claims to a novel vehicle with four wheels, steering, and a motor operatively connected to the wheels would be

patent ineligible because they merely automate walking from point A to point B, which humans have done for years.

Under Step Two, the district court made unsupported factual findings and relied on inapplicable case law. Consequently, its conclusion that the Claims at Issue lack an inventive concept was error, providing a separate, independent reason why its dismissal order should be reversed.

## CONCLUSION

For the foregoing reasons, the district court's order granting in part iFIT's Rule 12(b)(6) motion and finding the Claims at Issue ineligible should be reversed. Allowing it to stand would create profound uncertainty as to the eligibility of claims to mechanical inventions, such as the Claims at Issue, substantially weakening the patent system in the United States.

February 13, 2024

Respectfully Submitted,

By: /s/ Thomas J. Leach

Thomas J. Leach
Michael A. Erbele
MERCHANT & GOULD P.C.
150 South Fifth Street
Suite 2200
Minneapolis, MN 55402
(612) 332-5300

Joshua A. Hartman
MERCHANT & GOULD P.C.
1900 Duke Street, Suite 600
Alexandria, VA 22314
(703) 684-2500

*Attorneys for Plaintiff-Appellant PowerBlock Holdings, Inc.*

# ADDENDUM

# ADDENDUM

| APPX Begin | APPX End | Docket No. | Date Filed | Document |
|---|---|---|---|---|
| 1 | 20 | 36 | 9/29/23 | Memorandum Decision and Order Granting in Part and Denying in Part Defendant's Motion to Dismiss |
| 27 | 51 | | | U.S. Patent No. 7,578,771 |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| POWERBLOCK HOLDINGS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>IFIT, INC.,<br><br>Defendant. | **MEMORANDUM DECISION & ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS**<br><br>Case No. 1:22-cv-00132-JNP-CMR<br><br>District Judge Jill N. Parrish |

Plaintiff PowerBlock Holdings, Inc., through their Complaint, ECF No. 2 ("Complaint"), alleges that Defendant iFit, Inc. infringed Plaintiff's patent in violation of 35 U.S.C. § 271 *et seq*. and thereby committed an unfair and unlawful business act under UTAH CODE ANN. § 13-5a-101 *et seq*. Defendant has moved this court to dismiss the Complaint for failure to state a claim upon which relief can be granted pursuant to FED. R. CIV. P. 12(b)(6). *See* ECF No. 22 ("Motion"). For the reasons discussed below, Defendant's Motion is **GRANTED IN PART AND DENIED IN PART**.

## BACKGROUND

At issue in this case is U.S. Patent No. 7,578,771, ECF No. 2-2 ("'771 patent"), titled "Weight Selection and Adjustment System for Selectorized Dumbbells Including Motorized Selector Positioning." Complaint ¶ 17. The '771 patent relates to automated "selectorized dumbbells," *id*. ¶ 18, that is, adjustable dumbbells to which plates are affixed by operation of a motor while the dumbbells are in a resting position on a stand. The '771 patent is "generally

directed" to selectorized dumbbells. *Id.* ¶ 30. Plaintiff alleges that Defendant iFit manufactures and sells the NordicTrack iSelect Adjustable Dumbbell, and that such product infringes "at least" claim 20 of the '771 patent, *id.* ¶¶ 21-25, which requires "a handle; weight plates; an electric motor that causes the weight plates to be coupled to each end of the handle; and a data entry device to allow users to input a weight selection decision and control the motor." *Id.* ¶ 18.

Defendant, in turn, argues that the claims of the '771 patent are directed to subject matter that is ineligible for patent protection under 35 U.S.C. § 101. Motion at 1. Thus, whether Plaintiff has stated a claim upon which relief can be granted turns on whether the claims of the '771 patent, as a matter of law, are directed to patent-ineligible subject matter and, if so, whether they nonetheless supply an inventive concept that merits patent protection. The court concludes that claims 1-18 and claim 20 of the '771 patent are directed to patent-ineligible subject matter and fail to add significantly more; however, because claim 19 is subject to 35 U.S.C. § 112 ¶ 6, as discussed below, the court concludes that dismissal would be imprudent at this juncture, and Defendant's motion to dismiss Plaintiff's two claims for relief, both resting on a theory of patent infringement, is therefore **GRANTED IN PART AND DENIED IN PART**.

## LEGAL STANDARD

Dismissal of a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure is appropriate where the plaintiff fails to state a claim upon which relief can be granted. When considering a motion to dismiss for failure to state a claim, a court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to the plaintiff." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (citation omitted). The complaint must allege more than labels or legal conclusion and its factual allegations "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[W]hether a [patent] claim recites patent eligible subject matter is a question of law which may contain underlying facts," and patent eligibility may be resolved at the motion-to-dismiss stage. *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 719 (Fed. Cir. 2014); *accord Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018); *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1372 (Fed. Cir. 2020).

## DISCUSSION

Whether Plaintiff states a claim upon which relief can be granted in this case is a matter of whether the claims of the '771 patent are patent eligible under 35 U.S.C. § 101 as interpreted by the two-step test established by the Supreme Court in *Alice Corp. Pty. Ltd. v. CLS Bank Intl*, 573 U.S. 208 (2014). At *Alice* Step One, we must "determine whether the claims at issue are directed to a patent-ineligible concept." *Id.* at 218. At *Alice* Step Two, we "consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent eligible application." *Id.* at 217 (quotation omitted). The second step of the *Alice* test is satisfied when the claim limitations "involve more than performance of well-understood, routine, [and] conventional activities previously known to the industry." *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347-48 (Fed. Cir. 2014) (quotation omitted).

### I. *Alice* Step One

35 U.S.C. § 101 provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of" Title 35 of the United States

Code. The Supreme Court has long held that "[l]aws of nature, natural phenomena, and abstract ideas are not patentable" under § 101. Alice, 573 U.S. at 216 (citing *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013)). Of these patent-ineligible categories, the boundaries of abstract ideas are of particular concern here, since Defendant argues that the '771 patent is directed to an abstract idea. Motion at 1.

### A. Relevant Federal Circuit Standards

The Supreme Court "has not established a definitive rule to determine what constitutes an abstract idea" for the purposes of *Alice* Step One, *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016) (quotation omitted), but a corpus of controlling decisions by the United States Court of Appeals for the Federal Circuit, which has appellate jurisdiction over patent claims, 28 U.S.C. § 1295(a)(1), guides this court's inquiry. Among the most significant dimensions of abstraction that guides this court's analysis at *Alice* Step One is a line of cases that consider whether the claims in the patents at issue focus on a specific means or method that improves a relevant technology.

When reading a patent as a whole and in light of the written description, if the court concludes that a claim is directed towards an "improved . . . device," it must conclude that the claim is "not directed to a result or effect that itself is the abstract idea[.]" *CardioNet*, 955 F.3d at 1368. Thus, the court, at *Alice* Step One, searches for "specific means for technological improvements." *Ficep Corp. v. Peddinghaus Corp.*, No. 2022-1590, 2023 U.S. App. LEXIS 21842, at *13 (Fed. Cir. Aug. 21, 2023); *accord EcoServices, LLC v. Certified Aviation Serv., LLC*, 830 F. App'x 634, 642-43 & n.5 (Fed. Cir. 2020) (unpublished) (claims for systems for washing jet engines directed to "a specific combination of a type of washing unit, information detector, and control unit, configured in a certain way" provided technical improvements such as a higher degree

of quality of an engine washing procedure). If, on the other hand, such patents are instead determined to be directed to a broad result or effect of certain functions, the court must move on to *Alice* Step Two in search of an inventive concept. *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016); *Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, No. 2015-1570, 827 F.3d 1042, 2016 U.S. App. LEXIS 12352, 2016 WL 3606624, at *4 (Fed. Cir. July 5, 2016); *CardioNet*, 955 F.3d at 1368; *Enfish*, 822 F.3d at 1336.

This distinction turns in part on whether patents would claim "*how*" certain results are achieved with sufficient particularly, or whether they are formulated using outcome-oriented, functional terms. *Univ. of Fla. Research Found., Inc. v. GE Co.*, 916 F.3d 1363, 1368 (Fed. Cir. 2019); *accord Ficep Corp.*, 2023 U.S. App. LEXIS 21842, at *12-13. In making this distinction, the court looks to the language of the claims themselves. *Yanbin Yu v. Apple Inc.*, 1 F.4th 1040, 1043-44 (Fed. Cir. 2021).[1] "Even a specification full of technical details about a physical invention may nonetheless conclude with claims that claim nothing more than the broad law or abstract idea underlying the claims." *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 769 (Fed. Cir. 2019).

Such an emphasis on specific means and processes, rather than general outcomes or effects, is deeply rooted in American patent jurisprudence, and stems from concerns over patents which,

---

[1] At *Alice* Step One, Federal Circuit precedent directs this court to "look[] at the focus of the claims, their character as a whole," *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) (cleaned up); *accord Voter Verified, Inc. v. Election Sys. & Software LLC*, 887 F.3d 1376, 1385 (Fed. Cir. 2018) (considering the "claims as a whole"); *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1367 (Fed. Cir. 2020) (considering claims in their "entirety"). Elsewhere, the Federal Circuit has characterized "the heart of the claimed invention," *Intellectual Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1328 (Fed. Cir. 2017), in its Step One analysis to determine whether claims are directed to a patent-ineligible subject matter.

if enforced, might stifle innovation. *See Alice*, 573 U.S. at 223-24. "A patent is not good for an effect, or the result of a certain process" because such patents "would prohibit all other persons from making the same thing by any means whatsoever." *Le Roy v. Tatham*, 55 U.S. 156, 175 (1853); *McRO*, 837 F.3d at 1314; *O'Reilly v. Morse*, 56 U.S. 62, 113 (1854) ("If this claim can be maintained, it matters not by what process or machinery the result is accomplished."). A patent may issue "for the means or method of producing a certain result, or effect, and not for the result or effect produced." *Diamond v. Diehr*, 450 U.S. 175, 182 n.7 (1981). Such an emphasis on protecting processes and methods may be characterized as "the preoccupation of patent law with *means*." CHISUM ON PATENTS § 1.01 (emphasis in original).

The Federal Circuit has also developed a body of cases concerning the question of automation, which is at issue here. Where patent claims are directed toward automating previously manual activities, the claims at issue must "achieve a level of automation that provides an improvement over the prior art," *EcoServices*, 830 F. App'x at 642 (unpublished), and must describe a specific means, as discussed above, including by being "directed to a specific combination" or configuration of components "to create technical improvements." *Id*. That is, merely "eliminat[ing] human error by automating" processes is not the sort of improvement that makes claims patent-eligible under *Alice* Step One, and the improvements must come from the particular process or method identified in the patent claims rather than the mere fact of automation. *Ficep Corp.*, 2023 U.S. App. LEXIS 21842, at *14-15; *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1095 (Fed. Cir. 2016) ("While the claimed system and method certainly purport to accelerate the process of analyzing audit log data, the speed increase comes from the capabilities of a general-purpose computer, rather than the patented method itself."); *Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Can. (U.S.)*, 687 F.3d 1266, 1278 (Fed. Cir. 2012) ("[T]he fact that the

required calculations could be performed more efficiently via a computer does not materially alter the patent eligibility of the claimed subject matter."); *accord Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1055 (Fed. Cir. 2017) ("[M]ere automation of manual processes using generic computers does not constitute a patentable improvement in computer technology."); *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016); *see also In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d at 612; *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015).

The court notes that the gravamen of the Federal Circuit case law regarding automation under *Alice* Step One relates to data-processing and similar computational processes, which the Plaintiff characterizes as "pen and paper" processes. For example, both *Ficep Corp*., 2023 U.S. App. LEXIS 21842, at *9, and *Univ of Fla.*, 916 F.3d at 1367, discuss this sort of process automation. *See also In re Killian*, 45 F.4th 1373, 1379 (Fed. Cir. 2022) ("Where the focus of the claimed advance over the prior art shows that the claim's character as a whole is directed to steps that can be performed in the human mind, or by a human using a pen and paper the claim is for a patent-ineligible abstract idea.") (cleaned up). But while such "pen and paper" or "pencil and paper" processes are a "telltale sign of abstraction," *Trinity Info Media, LLC v. Covalent, Inc.*, 72 F.4th 1355, 1361 (Fed. Cir. 2023), abstract ideas are not relegated merely to the realm of such data-processing and analytical processes. Indeed, "whether a device is a tangible system (in § 101 terms, a machine) is not dispositive." *Yu*, 1 F.4th at 1044 n.2 (cleaned up); *see also Alice*, 573 U.S. at 224; *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d at 611 ("[N]ot every claim that recites concrete, tangible components escapes the reach of the abstract-idea inquiry."); *accord Chamberlain Grp. v. Techtronic Indus. Co.*, 935 F.3d 1341, 1348 (Fed. Cir. 2019) ("Without more, the mere physical nature of CGI's claim elements (e.g., controller, interface, and wireless data transmitter) is not

enough to save the claims from abstractness, where the claimed advance is directed to the wireless communication of status information using off-the-shelf technology for its intended purpose."); *contra* ECF No. 29 at 15.

**B. Whether Claim 20 is Representative**

With this doctrinal foundation laid, the court moves to consider the claims of the '771 patent, including whether a representative claim may be selected from among the patent's twenty claims. Defendant argues that the '771 patent is directed to patent-ineligible subject matter because it claims "a simple combination of conventional, generic, off-the-shelf components that are merged to automate a practice that, for many years, has been performed manually" under the lines of Federal Circuit precedent discussed above. Motion at 7. Defendant further asserts that claim 20 is representative of the patent. ECF No. 30 at 10 n.7. Plaintiff argues, in turn, that claim 20 is not representative, ECF No. 29 at 23, because even though the Complaint points only to claim 20 in particular, Complaint ¶¶ 24, 25, 32 (stating that Defendant's product meets every limitation of at least independent claim 20), its action is facially pleaded under the '771 patent generally.

While Defendant argues that "[a]ny of the independent claims of the '771 patent could have been used as a representative claim given their similarities," ECF No. 30 at 10 n.7, Plaintiffs point out that independent claim 20 is unique in that it also requires a data entry device. ECF No. 29 at 7. Additionally, in their opposition memorandum, Plaintiff argues that claim 19, in particular, is sufficiently distinguishable from claim 20 because the former uses "means . . . for" language, which entitles it to a presumption of the operation of 35 U.S.C. § 112 ¶ 6.

Despite the parties' disagreement regarding claim representativeness, this court may select a representative claim to stand in the place of the patent generally. *See Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018) (citing *Elec. Power Grp. v. Alstom S.A.*, 830 F.3d 1350, 1352

(Fed. Cir. 2016)) ("Courts may treat a claim as representative in certain situations, such as if the patentee does not present any meaningful argument for the distinctive significance of any claim limitations not found in the representative claim or if the parties agree to treat a claim as representative."); *see also Mortgage Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1324 n.6 (Fed. Cir. 2016)*; E-Numerate Sols., Inc. v. United States*, 149 Fed. Cl. 563, 574 (2020). And there is strong reason to believe that claim 20 should be treated as representative considering, for example, Plaintiff's decisions (a) to use claim 20 to characterize the '771 patent generally in the Complaint, *see* Complaint ¶ 18, *as well as* in their opposition memorandum, *see* ECF No. 29 at 11, (b) to point to claim 20 several times throughout the Complaint as the infringed claim, *see* Complaint ¶¶ 24, 25, 32, (c) to use claim 20 as the basis for its patent claim chart attached to the Complaint as Exhibit C, *see* ECF No. 2-4, and (d) generally to individually identify only claim 20 through the course of the entire Complaint. *See generally* Complaint.

However, this court ultimately concludes that claim 20 is not representative of the '771 patent insofar as claim 19's invocation of "means . . . for" language entitles it to the operation of 36 U.S.C. § 112 ¶ 6, which is applicable only to that claim.[2] Thus, in the following sections, the

---

[2] The presumption that § 112 ¶ 6 does not apply given the lack of "means" language is overcome only where "the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015) (en banc) (quoting *Watts v. XL Systems, Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000)). With this rule set forward in *Williamson* in mind, and given the general principle that "the use of the term means has come to be so closely associated with means-plus-function claiming that it is fair to say that the use of the term means (particularly as used in the phrase means for) generally invokes and that the use of a different formulation generally does not," *Personalized Media Communs., LLC v. ITC*, 161 F.3d 696, 703 (Fed. Cir. 1998) (cleaned up), this court declines to find that the presumption against applying 35 U.S.C. § 112 ¶ 6 has been overcome as to claims 1-18 and claim 20. Therefore, these claims will not be read as incorporating by reference the particular elements, structures, or processes described in the patent specification.

court first applies *Alice* Step One to claims 1-18 and claim 20 before moving on to consider claim 19.

**C. Whether Claims 1-18 and Claim 20 are Directed to Patent-Ineligible Subject Matter**

On the substantive question of whether claims 1-18 and claim 20 are directed to a patent-ineligible abstract idea, Defendants argue that the patent claims are directed towards an end result (merely automating a process to achieve the desired end result of stacking plates on a dumbbell) rather than claiming a specific means or method that improves the relevant technology. Plaintiff, in response, characterizes the '771 patent as "directed to an improved weight selection and adjustment system rather than to an abstract result or effect," pointing to the language of that claim as reciting a specific means for improving the relevant technology and arguing that the specific combination of elements constitutes such a system. ECF No. 29 at 11 (citation omitted). The three elements to which Plaintiff points are:

> (a) a "dumbbell that provides an exercise weight that . . . is adjustable by coupling more or fewer weight plates" to each end of the dumbbell's handle;
> (b) an "electric motor that may be selectively energized . . . [to] cause a desired number of weight plates to be coupled to each end of the handle"; and
> (c) a "data entry device" through which a user can "input a weight selection decision that operatively controls the energization of the motor to adjust the exercise weight of the dumbbell . . . ."

*Id.* (quoting '771 patent at 14:35-57).

---

Additionally, the court understands Plaintiff to have conceded at oral argument, *see* ECF No. 34, that ¶ 6 is only properly applied to claim 19.

Plaintiffs also point to *EcoServices*, claiming that the '771 patent, like the patent in that case, claims a "specific system" or "specific solution for accomplishing" a technical goal, and is therefore directed to an "improved system." *Id*. at 12. Plaintiffs point out that the patent at issue in *EcoServices* also "included three structural elements," *id.* at 11, and also involved the automation of a process previously performed by humans. But this is where the meaningful parallels between the *EcoServices* patent and the '771 patent end. Unlike the patent at issue in *EcoServices*, claim 20 lacks sufficient specification of any truly "specific configuration[]," *EcoServices*, 830 Fed. App'x. at 638 (unpublished), and instead outlines only the conceivably necessary components for any automated weight-stacking mechanism.

Claim 20 is impermissibly broad and outcome-oriented in construction. The three structural components described in that claim consist merely of (a) "a dumbbell" which can be lifted, the weight of which "is adjustable"; (b) an "electric motor," which "will cause a desired number of weight plates to be coupled" to the dumbbell; and (c) "a data entry device" to allow a user to "control[]" the motor. ECF No. 29 at 11 (quoting '771 patent at 14:35-57) (emphasis added). The claim language here describes an end result—such as the *causing* of weights to be coupled—without recitation of specific means of doing so, unlike as in *EcoServices*. While the specification outlines much more detailed parts and processes, claim 20 itself does not require such elements (nor does it incorporate these elements by reference), but is instead much more broadly formulated. Thus, the '771 patent is much more analogous to the patent at issue in *Univ. of Fla*. than the one in *EcoServices* because the '771 patent's independent claims merely describe the general function of components (dumbbells providing exercise weights, motors that cause coupling, and data entry devices that allow users to input weight), rather than "*how*" the parts perform the functions claimed. *Univ. of Fla*., 916 F.3d at 1368; *accord In re TLI Commc'ns Patent Litig.*, 823 F.3d at 612

(finding a patent directed to patent-ineligible subject matter where it "fails to provide any technical details for the tangible components . . . instead predominantly describ[ing] the system and methods in purely functional terms.").

Further, the use of any electric motor to enable such coupling is insufficiently specific to constitute a "*specific* solution," *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1151 (Fed. Cir. 2019) (emphasis added); *McRO*, 837 F.3d at 1314, for accomplishing automated dumbbell weight stacking. In other words, no limitations in claim 20 "prevent preemption of all processes for achieving automated" weight stacking. *See McRO*, 837 F.3d at 1315.[3] Claim 20 would thus seem to cover all or substantially all systems for automated dumbbell plate stacking involving electric motors and data entry systems and is therefore overly broad.

Claim 1 is similarly directed to patent-ineligible subject matter for the reasons described above, and its exclusion of the data entry system is immaterial. Even putting the issue of claim 20's representativeness to the side, claims 1 and 20 both seek to claim systems comprising weight selection and adjustment systems consisting of the two or three "generic" components, *CardioNet*, 955 F.3d at 1368, rather than any particular system or method of selectorized weight stacking under the standards defined by the Federal Circuit. The so-called "specific combination," ECF No. 29 at 11, consisting merely of the two or three components is not a specific means of accomplishing the need identified in the written description, *McRO*, 837 F.3d at 1314, and is instead directed towards

[3] In fact, as Defendant notes, the '771 patent seeks to define the terms "motor" or "motorized" as applying to "any powered device that converts electrical energy into physical motion[.]" Motion at 11 (quoting '771 patent at 11:43-47).

the general end of automated weight stacking.[4] These claims offer no meaningful additional description of specific processes or *means* of accomplishing automated weight stacking and are thus directed to the patent-ineligible subject matter of the outcome of automating a process previously done manually—a "result" of a certain process rather than the means. *Diehr*, 450 U.S. 175, 182 n.7.[5]

Upon review of the claims dependent upon claim 1 (i.e., claims 2-18), the court concludes that, because claim 1 is directed to an abstract idea and implemented using generic components requiring performance of the same basic process, the same is true of each dependent claim. *See Smart Sys. Innovations, LLC v. Chi. Transit Auth.*, 873 F.3d 1364, 1368 n.7 (Fed. Cir. 2017); *Realtime Data LLC v. Array Networks Inc.*, 537 F. Supp. 3d 591, 610 (D. Del. 2021); *accord People.ai, Inc. v. Clari Inc.*, Nos. 2022-1364, 2022-1366, 2023 U.S. App. LEXIS 8294, at *47 (Fed. Cir. Apr. 7, 2023). The additional elements of, for example, buttons (dependent claim 3), a visual display (dependent claim 4), a stand (dependent claims 5 and 6), and so on, do not meaningfully affect this court's analysis of claim 1 under *Alice* Step One, nor do they "change[] the focus of the asserted claim[]." *See Trinity Info Media*, 72 F.4th at 1362.

---

[4] E.g., by use an electric motor "as a tool to automate conventional activity." *McRO*. 837 F.3d at 1314.

[5] Plaintiffs also take issue with what they see as insufficient deference paid to the '771 patent's written description and articulation of needs met by the patent. *See* ECF No. 29 at 13; *see also CardioNet*, 955 F.3d at 1371 ("[T]he district court erred by disregarding the written description's recitation of the advantages of the claimed invention."). But the benefits purportedly wrought by the '771 patent, including in its written description, *see* ECF No. 29 at 13, consist of little or nothing more than removing the possibility of human error, which the '771 patent would not do in any manner that comes from any particular process or method identified in the patent claims. *Ficep Corp.*, 2023 U.S. App. LEXIS 21842, at *14-15. In short, these claims resemble a generic automation patent, *see Credit Acceptance Corp.*, 859 F.3d at 1055, focusing on ease and removal of human error generally.

In sum, because the language of claims 1-18 and claim 20, read in light of the patent as a whole, is defined by the general outcome or effect of automated selectorized dumbbell weight stacking, those claims of the '771 patent give rise to a preemption problem under which the claims as written would ostensibly preempt any weight-selection and adjustment system. Thus, the court holds that claims 1-18 and claim 20 of the '771 patent are directed to patent-ineligible subject matter, and subsequently moves on to *Alice* Step Two in search of an inventive concept as to those claims.

**D. Whether Claim 19 is Directed to Patent-Ineligible Subject Matter**

As discussed above, claim 19 is not properly represented by claim 20, and its use of the terminology "means . . . for" presumptively requires construction of the claim limited to any specific corresponding structures described in the patent specification that perform the function identified in the claim. *See* 35 U.S.C. § 112 ¶ 6;[6] *Personalized Media*, 161 F.3d at 703-04; *York Prods., Inc. v. Central Tractor*, 99 F.3d 1568, 1574 (Fed. Cir. 1996) ("In determining whether to apply the statutory procedures of [§ 112, P 6], the use of the word 'means' triggers a presumption that the inventor used this term advisedly to invoke the statutory mandates for means-plus-function clauses."); *TriMed, Inc. v. Stryker Corp.*, 514 F.3d 1256, 1259-60 (Fed. Cir. 2008) (holding that the presumption that § 112 applies may be overcome where the claim language specifies the exact structure that performs the function in question).

Where a claim invokes 35 U.S.C. § 112 ¶ 6, the court must first identify the claimed function and, second, determine whether sufficient structure is disclosed in the specification that

---

[6] Section 112, paragraph 6 provides that "an element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof." 35 U.S.C. § 112 ¶ 6 (1994).

corresponds to the claimed function. *Synchronoss Techs., Inc. v. Dropbox, Inc.*, 987 F.3d 1358, 1367 (Fed. Cir. 2021). Such structures disclosed in the specification must be "clearly linked" to the claimed function, *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1328 (Fed. Cir. 2003), meaning that the specification or prosecution history clearly links or associates that structure to the function recited in the claim. *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997); *accord In re Donaldson Co.*, 16 F.3d 1189, 1195 (Fed. Cir. 1994) ("If one employs means-plus-function language in a claim, one must set forth in the specification an adequate disclosure showing what is meant by that language. If an applicant fails to set forth an adequate disclosure, the applicant has in effect failed to particularly point out and distinctly claim the invention as required by the second paragraph of section 112."). "This duty to link or associate structure to function is the *quid pro quo* for the convenience of employing § 112, [¶] 6." *B. Braun Med.*, 124 F.3d at 1424.

Claim 19, in relevant part, claims "means selectively actuable by the user for adjusting the exercise weight of each dumbbell without requiring the user to physically contact and move the selector himself or herself." *See* '771 patent at 14:29-32. Considering the two-step test laid out in *Dropbox*, 987 F.3d 1358, the function claimed here is dumbbell weight-adjustment not requiring physical contact by the user, while the structures described in the patent specification might include, for example, "selector 35" and the "front and back pin arrays 36f and 36b," and other components outlined, for example, at 6:31-56 of the '771 patent.[7] While the court declines to conclusively construct the claim terms at this juncture, the court posits that claim 19, by operation

[7] In any case, at this stage in the litigation it is not necessary to construct the precise boundaries of claim 19, which is better suited, for example, for a *Markman* hearing.

of 35 U.S.C. § 112 ¶ 6, plausibly identifies with sufficient particularity certain structures in the patent specification so as to be directed to a specific means of accomplishing a particular task, rather than the general, abstract outcome of an automated selectorized dumbbell. *See McRO*, 837 F.3d at 1314. In this way, claim 19 may not be subject to the abstraction that ails independent claims 1 and 20 and, as a result, dependent claims 2-18.[8] However, because the parties failed to meaningfully argue this issue, the court declines to offer a square holding on this issue.

Instead, Defendant's Motion is denied as to claim 19 of the '771 patent because Defendant failed to sufficiently distinguish claim 19 from claim 20, which it asserted was representative of the whole patent. District courts have previously denied motions to dismiss patent infringement claims because Defendants have similarly failed to address means-plus-function claims, instead claiming that non-means-plus-function claims are representative, and such dismissals have been affirmed by the Federal Circuit. *Uniloc USA, Inc. v. AVG Techs. USA, Inc.*, No. 2:16-CV-00393-RWS, 2017 WL 1154927, at *4, 2017 U.S. Dist. LEXIS 45125 (E.D. Tex. Mar. 28, 2017), *aff'd sub nom. Uniloc USA, Inc. v. ADP, LLC*, 772 F. App'x 890 (Fed. Cir. 2019). For this reason, the court concludes that granting Defendant's Motion is inappropriate as to claim 19 without more substantial party argument, and the *Alice* inquiry as to that claim ends here.

**II. *Alice* Step Two (Claims 1-18, 20)**

Because claims 1-18 and claim 20 are directed to patent-ineligible subject matter under *Alice* Step One, the court proceeds to *Alice* Step Two as to those claims. *Alice* Step Two "requires

[8] Admittedly, the court harbors some doubt that, even given the benefit of 35 U.S.C. § 112 ¶ 6, claim 19 is spared the doctrinal analysis set out in this order. However, without more meaningful briefing, the court declines to grant Defendant's Motion as to that claim, and reserves judgment on the issue.

[the court] to look with more specificity at what the claim elements add, in order to determine whether they identify an inventive concept in the application of the ineligible subject matter to which the claim is directed. Simply appending conventional steps, specified at a high level of generality, is not enough to supply an inventive concept." *Chamberlain Grp.*, 935 F.3d at 1348 (cleaned up). *Alice* Step Two is thus a search for "additional features" to ensure that "the claim is more than a drafting effort designed to monopolize the abstract idea." *Alice*, 573 U.S. at 221 (cleaned up).

While the written description of the '771 patent "touts the benefits of the patented selectorized dumbbell," ECF No. 29 at 13, the language of the patent itself recognizes that the better part of the claims of the '771 patent, ultimately, rests upon a straightforward assembly of generic machinery employed in their conventional use cases. As Defendant notes, the '771 patent itself acknowledges that *both* selectorized dumbbells generally *and* data-entry devices such as the one at issue in claim 20 were well-known at the time of the '771 patent's issuance. Motion at 3-5. Of course, "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces," *BASCOM Glob. Internet Servs. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016), but such is not the case here. The dumbbell, motor, and user interface at issue in claims 1-18 and claim 20 are all used conventionally and in their generic, routine, and conventional use cases. *See Alice*, 573 U.S. at 225. Further, the function performed by each of the elements in dependent claims 2-18 is similarly "conventional" and lacks any indicium of inventiveness. *Id.* The claims of the '771 patent, then, would monopolize the abstract idea of automated selectorized dumbbells—stating the abstract idea of an automated selectorized dumbbell and essentially saying "apply it." *Id.* at 221.

Additionally, the benefits identified by claims 1-18 and claim 20 of the '771 patent are generally those conferred by the simple fact of automation and the removal of human operators rather than any benefit of the particular methods or processes identified in the patent. *See FairWarning*, 839 F.3d at 1095-97. Many precedential Federal Circuit opinions made clear that making existing processes more quick or accurate by means of a computer does not satisfy the "significantly more" Step Two analysis under *Alice*, 573 U.S. at 218, and this court concludes that, even absent a computer *per se*, automation of existing tasks through an electric motor that offers mere convenience or reduced error similarly does not add "significantly more" for much the same reasons. *See Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1367 (Fed. Cir. 2015)*; OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015); *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Can. (U.S.)*, 687 F.3d 1266, 1278 (Fed. Cir. 2012). While Plaintiff rests on the fact the task automated under the '771 is "physical," ECF No. 29 at 22, the court finds the distinction unpersuasive given the thrust and rationale of the Federal Circuit as outlined in the above-cited cases.

Instead, at a high level, claims 1-18 and claim 20 of the '771 patent recite "generic, conventional elements" of dumbbells, motors, and data entry devices, *Ficep Corp.*, 2023 U.S. App. LEXIS 21842, at *15, merely automating conventional selectorized dumbbell functions and process. The generic motor-automated machine is not meaningfully different than the conventional one, and the court thus fails to find an inventive concept as to these claims. *Id*. Each component at issue in those claims, used in a conventional and generic way, is merely a "conduit for the abstract idea" of the *result* of an automated selectorized dumbbell. *In re TLI Communs. LLC Patent Litig.*, 823 F.3d at 612.

In conclusion, because the court holds that claims 1-18 and claim 20 of the '771 patent are directed to patent-ineligible subject matter, and because those claims do not add significantly more than the abstract idea of the end-result of an automated selectorized dumbbell, they fail the test established by the Supreme Court in *Alice*. But because claim 19, and the effects of the operation of 35 U.S.C. § 112 ¶ 6 in the *Alice* inquiry as to that claim, are not sufficiently argued, the court concludes that dismissal as to that claim would be inappropriate. On this ground, Defendant's Motion is **GRANTED IN PART AND DENIED IN PART** as to Plaintiff's First Claim. Thus, Plaintiff's claim for patent infringement may proceed only as to claim 19 of the '771 patent. Additionally, insofar as the Motion is denied (that is, as to claim 19), it is denied without prejudice, and Defendant may renew its motion through future Rule 12 argument if it elects to do so.[9]

## III. Utah Unfair Competition Act

Plaintiff's Second Claim alleges that Defendant "has committed unlawful and unfair intentional business acts by knowingly and intentionally infringing the '771 patent," Complaint ¶ 44, thereby violating the Utah Unfair Competition Act, UTAH CODE ANN. § 13-5a-101 *et seq*. Section 13-5a-102(4)(a)(ii)(B) defines "unfair competition" to mean, in part, an intentional business act or practice that includes infringement of a patent. Because, by virtue of claim 19 of the '771 patent, Plaintiff has stated a claim upon which relief can be granted for patent infringement, the court concludes that Plaintiff has also stated a claim for which relief can be granted under the Utah Unfair Competition Act. Defendant's motion to dismiss the Second Claim,

[9] The court has elected to consider future Rule 12 motion practice directed to claim 19 as a result of the parties' general failure to meaningfully argue the significance of 35 U.S.C. § 112 ¶ 6 in the *Alice* inquiry as to claim 19, including with regard to which structures are incorporated by reference through the operation of that paragraph.

then, is **GRANTED IN PART AND DENIED IN PART** on the same grounds as under Claim One.

**CONCLUSION**

For the foregoing reasons and subject to the considerations discussed above, Defendant's motion to dismiss, ECF No. 22, is hereby **GRANTED IN PART AND DENIED IN PART**.

DATED September 29, 2023.

BY THE COURT

Jill N. Parrish
United States District Court Judge

US007578771B1

(12) **United States Patent**
**Towley, III et al.**

(10) **Patent No.: US 7,578,771 B1**
(45) **Date of Patent: Aug. 25, 2009**

(54) **WEIGHT SELECTION AND ADJUSTMENT SYSTEM FOR SELECTORIZED DUMBBELLS INCLUDING MOTORIZED SELECTOR POSITIONING**

(75) Inventors: **Carl K. Towley, III**, Alexandria, MN (US); **Gregory S. Olson**, Owatonna, MN (US)

(73) Assignee: **Intellex, Inc.**, Owatonna, MN (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 28 days.

(21) Appl. No.: **11/999,742**

(22) Filed: **Dec. 6, 2007**

**Related U.S. Application Data**

(60) Provisional application No. 60/873,681, filed on Dec. 8, 2006.

(51) **Int. Cl.**
*A63B 21/072* (2006.01)
*A63B 21/075* (2006.01)

(52) **U.S. Cl.** ........................... **482/106**; 482/5; 482/104; 482/108

(58) **Field of Classification Search** ..................... 482/5, 482/93, 94, 104, 106–108, 908
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,529,198 | A * | 7/1985 | Hettick, Jr. | 482/104 |
| 4,720,099 | A * | 1/1988 | Carlson | 482/133 |
| 5,769,762 | A * | 6/1998 | Towley et al. | 482/93 |
| 6,039,679 | A * | 3/2000 | Yu | 482/110 |
| 7,264,578 | B1 * | 9/2007 | Krull | 482/108 |
| 2003/0148862 | A1 * | 8/2003 | Chen et al. | 482/108 |

* cited by examiner

*Primary Examiner*—Fenn C Mathew
*Assistant Examiner*—Andrew M Tecco
(74) *Attorney, Agent, or Firm*—James W. Miller

(57) **ABSTRACT**

A weight selection and adjustment system for a selectorized dumbbell comprises a stand that holds a pair of selectorized dumbbells. The stand has an electric motor that is selectively energized by a controller for substantially simultaneously adjusting the weight of both dumbbells. The controller is responsive to a weight selection made by a user through a data entry device. The system can also be used with a single dumbbell placed on the stand. Alternatively, the electric motor can be mounted on the handle of a selectorized dumbbell to allow weight adjustment operations to be made without placing the selectorized dumbbell on a stand. In this embodiment, the data entry device and controller can also be carried on the handle of each selectorized dumbbell.

**20 Claims, 16 Drawing Sheets**






FIG. 1




FIG. 2




FIG. 3




FIG. 4




FIG. 5




FIG. 6




FIG. 7




FIG. 8




FIG. 9




FIG. 10




FIG. 11




FIG. 12




FIG. 13




FIG. 14




FIG. 15




FIG. 16

# WEIGHT SELECTION AND ADJUSTMENT SYSTEM FOR SELECTORIZED DUMBBELLS INCLUDING MOTORIZED SELECTOR POSITIONING

## CROSS REFERENCE TO RELATED APPLICATIONS

This application claims the benefit of one or more previously filed copending provisional applications identified as follows: Application Ser. No. 60/873,681 filed Dec. 8, 2006.

## TECHNICAL FIELD

This invention relates generally to exercise equipment. More particularly, this invention relates to selectorized dumbbells and to an overall, integrated system for selecting and adjusting the weight of a selectorized dumbbell or a pair of selectorized dumbbells.

## BACKGROUND OF THE INVENTION

Selectorized dumbbells overcome the cost and space obstacles presented by traditional dumbbells. In a selectorized dumbbell, a plurality of weights nest together. The weights provide a stack of nested left weight plates and a stack of nested right weight plates. The left and right stacks of weight plates are separated from one another by a gap.

In a selectorized dumbbell, a handle is inserted into the gap between the left and right stacks of weight plates. A selector is then manipulated to determine how many of the left and right weight plates of the weights are coupled to the left and right ends of the handle. Once the selector is positioned to pick up a selected number of weights, the handle can then be lifted by the user from between the stacks of weight plates. The selected number of weights will rise with the handle to be used in performing various exercises with the dumbbell.

While selectorized dumbbells represent a major advance in exercise equipment, the selectors used to adjust the weight of the dumbbell are mechanical members that must be directly gripped and manipulated by the user. A well known selectorized dumbbell is shown in U.S. Pat. No. 5,769,762, owned by the assignee of this invention. In the dumbbell shown in the 762 patent, the selector comprises a connecting pin that is manually inserted by the user into different locations on the handle to vary the number of weights connected to the handle. Other selectorized dumbbells use other types of mechanical selectors, such as rotatable shafts, knobs, or the like.

With mechanical and user positionable selectors, there is always the possibility that the user might not fully or correctly engage the selector. If this were to occur, one or more weights might inadvertently detach from the handle while the dumbbell is in use. This poses a risk of injury to the user or a risk of damage to the dumbbell. Obviously, this is a disadvantage.

Moreover, many exercises that a typical user might perform require the joint use of a pair of dumbbells. The weight of each dumbbell must be individually set or adjusted. In other words, the user first has to adjust the selector on one of the dumbbells to whatever weight is desired. Then, the user must repeat the procedure for the second dumbbell by adjusting the selector of the second dumbbell. The user must take care to see that the selectors on the two dumbbells are identically positioned to provide the same weight on each dumbbell. Given the small increments of adjusting movement in some known selectors, the user must pay close attention when moving the selector to make sure the proper amount of weight has been selected.



Finally, many people today are quite familiar with electronic devices in which data entry is accomplished by the manipulation of an alpha-numeric keyboard or a numeric keypad or the like. Such data entry devices are found on a host of products such as personal computers, cell phones, television remote controls, etc. Yet, no similar data entry device has been used to adjust the numbers of weights coupled to each end of the handle of a selectorized dumbbell. There is a need in the art to automate and ease the task of adjusting the weight of selectorized dumbbells.

## SUMMARY OF THE INVENTION

One aspect of this invention relates to a weight selection and adjustment system for a selectorized dumbbell. The system includes a selectorized dumbbell that comprises a stack of nested left weight plates and a stack of nested right weight plates, a handle having a left end and a right end, and a movable selector having a plurality of different adjustment positions in which the selector may be disposed. The selector is configured to couple selected numbers of left weight plates to the left end of the handle and selected numbers of right weight plates to the right end of the handle with the selected numbers of coupled weight plates differing depending upon the adjustment position in which the selector is disposed, thereby allowing a user to select for use a desired exercise weight to be provided by the selectorized dumbbell. An electric motor is operatively connected to the selector at least whenever a weight adjustment operation takes place. The electric motor when energized from a source of electric power physically moves the selector into the adjustment position corresponding to the desired exercise weight that was selected for use by the user.

Another aspect of this invention relates to a weight selection and adjustment system for a selectorized dumbbell. The system includes a selectorized dumbbell that comprises a stack of nested left weight plates and a stack of nested right weight plates, a handle having a left end and a right end, and a movable selector having a plurality of different adjustment positions in which the selector may be disposed. The selector is configured to couple selected numbers of left weight plates to the left end of the handle and selected numbers of right weight plates to the right end of the handle with the selected numbers of coupled weight plates differing depending upon the adjustment position in which the selector is disposed, thereby allowing a user to select for use a desired exercise weight to be provided by the selectorized dumbbell. A means selectively actuable by the user is provided for adjusting the exercise weight of each dumbbell without requiring the user to physically contact and move the selector himself or herself.

Yet another aspect of this invention relates to a weight selection and adjustment system for a dumbbell. The system includes dumbbell that provides an exercise weight that is lifted by a user when the user grips and lifts a handle of the dumbbell. The exercise weight provided by the dumbbell is adjustable by coupling more or fewer weight plates to each end of the handle. An electric motor is provided that may be selectively energized and when energized will cause a desired number of weight plates to be coupled to each end of the handle. A data entry device is provided to allow the user to input a weight selection decision that operatively controls the energization of the motor to adjust the exercise weight of the dumbbell in accordance with the weight selection decision input into the data entry device by the user.

An additional aspect of this invention comprises a weight selection and adjustment system for a dumbbell. The system includes a stand. A pair of dumbbells are supported on the

stand during a weight adjustment operation. Each dumbbell provides an exercise weight that is lifted by a user when the user grips and lifts a handle of the dumbbell. The exercise weight provided by each dumbbell is adjustable by coupling more or fewer weight plates to each end of the handle. A single operator is provided that is selectively actuated by a user from a position remote from the dumbbells for substantially simultaneously adjusting the exercise weight of both dumbbells as the dumbbells are supported on the stand.

## BRIEF DESCRIPTION OF THE DRAWINGS

This invention will be described more completely in the following Detailed Description, when taken in conjunction with the following drawings, in which like reference numerals refer to like elements throughout.

FIG. **1** is a perspective view of a first embodiment of a weight selection and adjustment system for selectorized dumbbells according to this invention, particularly illustrating a system used to adjust the weight of a pair of selectorized dumbbells that are placed atop a support stand;

FIG. **2** is a perspective view similar to FIG. **1**, but illustrating one of the selectorized dumbbells entirely removed from the stand to show the mechanical interlock fingers that project through the support tray of the stand as well as the electrical interlock sensors and the powered rotatable driver for rotating the selector of the dumbbell;

FIG. **3** is a perspective view similar to FIG. **2**, but illustrating both of the selectorized dumbbells removed from the stand;

FIG. **4** is a top plan view of the system of FIG. **1**;

FIG. **5** is a perspective view from the back of the system of FIG. **1** and from below the support tray of the stand, particularly illustrating the pair of selectorized dumbbells atop the support tray of the stand;

FIG. **6** is a perspective view similar to FIG. **5**, but with the vertical column or post of the stand having been removed to better illustrate the motor used to rotate the pair of rotatable drivers that simultaneously adjust the weight of both selectorized dumbbells;

FIG. **7** is a perspective view similar to FIG. **6**, but looking at the underside of the support tray from the front to again illustrate the motor drive to the pair of selectorized dumbbells along with the mechanical interlock fingers and electrical interlock sensors;

FIG. **8** is a perspective view of the handle of one of the selectorized dumbbells used in the system of FIG. **1**;

FIG. **9** is a bottom plan view of the handle of FIG. **8**, particularly illustrating the front and back pin arrays used for coupling desired numbers of weights to the handle;

FIG. **10** is a perspective view of the bottom of the handle of FIG. **8**, but with the U-shaped base of the handle having been removed to better illustrate the front and back pin arrays;

FIG. **11** is a perspective view of a portion of a second embodiment of a weight selection and adjustment system for selectorized dumbbells according to this invention, particularly illustrating only a portion of the support stand to thereby depict a system for manually but remotely and simultaneously adjusting the weight of a pair of selectorized dumbbells;

FIG. **12** is a perspective view of a third embodiment of a weight selection and adjustment system for selectorized dumbbells according to this invention, particularly illustrating a system used to adjust the weight of a pair of selectorized dumbbells placed atop a support stand;

FIG. **13** is a partial perspective view of a portion of the third embodiment of FIG. **12**, particularly illustrating the handles for the selectorized dumbbells with a portion of one of the handles having been omitted to better illustrate the selector used on each handle;

FIG. **14** is a perspective view of a handle of a selectorized dumbbell that is used as part of a fourth embodiment of a weight selection and adjustment system for selectorized dumbbells according to this invention;

FIG. **15** is a perspective view similar to FIG. **14**, but particularly illustrating the handle with the U-shaped base of the handle removed to illustrate a handle carried motor for operating the selector; and

FIG. **16** is a perspective view of a handle of a selectorized dumbbell that is used as part of a fifth embodiment of a weight selection and adjustment system for selectorized dumbbells according to this invention, particularly illustrating a handle in which both the motor, data entry device and controller are carried on the handle.

## DETAILED DESCRIPTION

One embodiment of a weight selection and adjustment system according to this invention is illustrated as **2**. System **2** includes a support stand **4** for holding a pair of selectorized dumbbells **6**. Stand **4** stores dumbbells **4** when they are not in use. In addition, dumbbells **4** are placed on stand **4** to adjust the overall weight of each dumbbell.

Stand **4** includes a base **8** for supporting stand **4** on the floor, a vertical column or post **10** attached to base **8** and extending upwardly therefrom, and an upwardly facing support tray **12** atop column or post **10**. The pair of selectorized dumbbells **6** are laid on top of the upper surface of support tray **12** as shown in FIG. **1**. Support tray **12** slants downwardly from the back towards the front and the front edge of support tray **12** includes an upturned lip **14**. Lip **14** prevents dumbbells **4** from sliding off support tray **12** of stand **4** when dumbbells **4** are positioned thereon.

Selectorized dumbbells **4** are identical to one another. Accordingly, a description of one dumbbell will serve to describe the other. Selectorized dumbbells **4** are similar to those shown in the assignee's prior U.S. Pat. No. 5,769,762, which is hereby incorporated by reference.

As is true for all selectorized dumbbells **4**, each dumbbell includes a plurality of weights **16** that provide two nested stacks of weight plates **18**. The stacks of weight plates **18** are separated by a gap into which the handle **20** of dumbbell **4** may be inserted. Handle **20** includes a handgrip **22** that extends perpendicularly relative to weight plates **18** when handle **20** is dropped down into the gap. For reference purposes, the stacks of weight plates will be referred to as a stack of nested left weight plates $\mathbf{18}_l$ adjacent a left end of handle **20** and a stack of nested right weight plates $\mathbf{18}_r$ adjacent a right end of handle **20**. See FIG. **2**.

In selectorized dumbbell **4** shown herein, each weight **16** comprises a left weight plate $\mathbf{18}_l$ and a right weight plate $\mathbf{18}_r$ joined together by a pair of front and back side rails $\mathbf{24}_f$ and $\mathbf{24}_b$. See FIG. **4**. Each dumbbell can have any desired number of weights **16**, but each dumbbell shown herein has a total of seven weights **16**. Since each weight **16** includes one left weight plate $\mathbf{18}_l$ and one right weight plate $\mathbf{18}_r$, there will be a total of seven nested left weight plates $\mathbf{18}_l$ and seven nested right weight plates $\mathbf{18}_r$. For clarity, only two of the seven weights **16** are shown in the drawings, namely the first or innermost weight **16**, i.e. the weight closest to handle **20**, and the seventh or outermost weight **16**, i.e. the weight furthest from handle **20**. The other left and right weight plates $\mathbf{18}_l$ and

$18_r$ of the other weights 16 will nest in between the illustrated left and right weight plates $18_l$ and $18_r$ of the first and seventh weights 16.

Weight plates 18 are attached to side rails 24 using carriers 26 that are bolted or screwed to inturned ends of side rails 24. The drawings illustrate two different carriers 26 on different ends of side rails 24 simply to illustrate different types of carriers that might be used. For example, one carrier 26 is fork-shaped having a pair of upwardly extending arms 28 that clamp weight plates 18 between them. The other carrier 26 is box-shaped with the weight plate being enclosed inside a surrounding box 30. As a practical matter, carriers 26 used on a particular dumbbell will typically be of the same type and not different types.

The use of carriers of some type to releasably attach weight plates is shown and described both in the assignee's published U.S. patent application 2004/0162198 as well as in the assignee's pending U.S. patent application Ser. No. 11/498,314 filed Aug. 2, 2006, both of which are hereby incorporated by reference. The latter pending patent application further shows and describes the fork-shaped carriers 26 with the upwardly extending arms 38.

Weights 16 of selectorized dumbbells 4 as shown herein can obviously be made in different ways. For example, carriers 26 could be deleted and weight plates 18 could be simply welded to side rails 24 or to other types of interconnecting members as shown in the 762 patent. Alternatively, weights 16 need not comprise a nested left weight plate $18_l$ and a nested right weight plate $18_r$ that are joined together. Instead, the nested left and right weight plates $18_l$ and $18_r$ could be separate from one another so that each weight 16 would then comprise merely a single weight plate $18_l$ or $18_r$. The use of separate weight plates 18 that are not joined together in pairs is well known in the selectorized dumbbell art.

Thus, the description of the structure of weights 16 provided herein is for illustrative purposes only. However, in a selectorized dumbbell, weights 16 will still be disposed in nested stacks of left and right weight plates $18_l$ and $18_r$, whether or not such weight plates are joined together in pairs.

With the types of weights 16 shown herein for selectorized dumbbell 4, front side rails $24_f$ overlie one another along a front side of dumbbell 4 and back side rails $24_b$ overlie one another along a back side of dumbbell 4. With this type of construction, it is well known in the selectorized dumbbell art, as shown in the 762 patent, to provide different configurations of holes and slots on the front and back side rails. For example, each side rail 24 could include a single connecting hole for receiving a connecting pin and various slots adjacent the hole. The position of the connecting hole is uniquely different for each side rail in the set of front side rails $24_f$ and in the set of back side rails $24_b$. This type of hole and slot configuration is shown in FIG. 22 of the 762 patent. This type of hole and slot configuration could be used in the front and back side rails $24_f$ and $24_b$, though other types of hole and slot configurations could also be devised.

Referring now to FIGS. 8-10, handle 20 of dumbbell 4 includes a U-shaped base 32 defining an internal cavity 34. Cavity 34 houses a selector 35 having a pair of pin arrays 36. A front pin array $36_f$ points towards the front of handle 20 and towards front side rails $24_f$. Similarly, a back pin array $36_b$ points towards the back of handle 20 and back side rails $24_b$.

Each pin array 36 is slidably mounted by bushings 38 on a pair of guide rods 40 contained within cavity 34 of handle 20. Each pin array 36 includes a plurality of connecting pins 42 carried on a base 37. The number of connecting pins 42 is equal in number to the number of weights 16, i.e. seven connecting pins 42 for the seven different weights 16. Normally, when no weights are coupled to handle 20, each pin array 36 is retracted or slid inwardly on guide rods 40 relative to cavity 34 such that all connecting pins 42 are disposed inwardly of the adjacent set of side rails $24_f$ or $24_b$.

A double lobed rotatable cam 44 is contained in cavity 34 of handle 20 between front and back pin arrays $36_f$ and $36_b$. Return springs (not shown) can be installed on guide rods 40 urging pin arrays 36 inwardly into engagement with the lobes of cam 44. One lobe $45_f$ of cam 44 engages against front pin array $36_f$ and the other lobe $45_b$ of cam 44 engages against back pin array $36_b$. The exact lateral positioning of each pin array 36 within cavity 34 of handle 20 will be determined by the rotary position of cam 44.

If cam 44 is incrementally rotated, the front and back pin arrays $36_f$ and $36_b$ can be incrementally moved out relative to handle 20 in a step-by-step, progressive fashion. This can be done in seven steps corresponding to the seven weights 16. In each increment of movement of pin arrays 36, one connecting pin 42 on each pin array 36 will enter a different one of the holes on side rails $24_f$ and $24_b$ to pick up another weight 16 to attach weight 16 to handle 20. Preferably, this will be done beginning with the first or innermost weight 16, then with the second weight 16, the third weight 16, and so on, until ending with the seventh or outermost weight 15. Thus, the weight of selectorized dumbbell 4 is adjusted by progressively sliding the front and back pin arrays 36 apart to pick up each of the seven weights 16 in turn. Cam 44 could be locked in any of its incrementally advanced positions by a suitable detent system operable between cam 44 and an adjacent fixed portion of handle 20.

In system 2 of this invention, the actuation or operation of selector 35, namely the movement of the front and back pin arrays $36_f$ and $36_b$, is accomplished using a motor 46. See FIGS. 7 and 8. In particular, an electric motor 46 which converts electric energy into the rotation of a motor drive shaft 48 is carried within column or post 10 of stand 4. Motor drive shaft 48 mounts a drive pulley 50 which is coupled by a belt 52 to a pair of driven pulleys 54 mounted on a pair of driven shafts 56. Driven shafts 56 are also contained within column or post 10 of stand 4. Thus, motor 46, pulleys 50 and 54, belt 52, and driven shafts 56 are normally enclosed within stand 4 beneath support tray 12.

Each driven shaft 56 has an upper end that forms a rotatable driver 58 that sticks through an opening in support tray 12. When selectorized dumbbells 4 are laid onto support tray 12 in their designated spots with one lateral side of each dumbbell 4 engaging against front lip of 14 support tray 12, each rotatable driver 48 will be aligned with and will enter into a socket 60 formed on the bottom of cam 44 on one dumbbell 4. Socket 60 is shown in FIG. 9. This is how rotation of motor 46 is simultaneously transmitted through the belt and pulley drive to both cams 44 of both dumbbells 4, namely through the pair of rotatable drivers 58. One driver 58 will rotate cam 44 on the first dumbbell while the other driver 58 will simultaneously and identically rotate cam 44 on the other dumbbell.

A data entry device 62 is provided on stand 4 to allow a user to input a weight selection decision into an electrical or electronic controller 64 that interfaces between data entry device 62 and motor 46. Controller 64 could be a part of data entry device 62 or a part of motor 46. Various types of data entry devices 62 could be used, but a device similar to a PDA or cell phone is preferred, namely a device 62 having a visual display 66 and a plurality of data entry keys or buttons 68. Data entry keys or buttons 68 could be virtual keys or buttons that are electronically shown on display 66 in the manner of a touch screen.

The user can use data entry device **62** to input a desired weight selection for dumbbells **4**. For example, if the user wishes that dumbbells **4** be adjusted to twenty pounds (corresponding to the coupling of the first two weights **16** to handle **20**), then the user can use keys or buttons **68** of data entry device **62** to input a twenty pound weight selection decision. Display **66** will show the amount of weight the user has selected and can then, if desired, ask the user to confirm the weight selection decision. Again, the type of data entry device **62**, the kinds of steps the user might have to take to input the weight selection decision he or she has made, the types of displays **66** or menus that might be used on such displays, can obviously vary.

Once the user has made a weight selection decision, input that decision into data entry device **62**, and then confirmed that decision if confirmation is required by data entry device **62**, then controller **64** can selectively apply electrical power to motor **46**. The amount and/or duration of such power is controlled to incrementally advance motor **46**, and thus the two rotatable drivers **58**, far enough to pick up the desired number of weights **16**. Precise control of the rotation of motor **46** can be achieved using a stepper motor or a shaft encoder **70** (shown in FIG. **6**) to precisely measure and determine the amount of rotation of motor drive shaft **48**.

In the example above of a twenty pound weight selection, motor **46** and drivers **58** are rotated just far enough that the front and back pin arrays $\mathbf{36}_f$ and $\mathbf{36}_b$ have advanced two steps to insert connecting pins **42** through the holes of side rails $\mathbf{24}_f$ and $\mathbf{24}_b$ for the first two weights **16**. Once the weight adjustment has been accomplished by system **2**, the user can then lift dumbbells **4** off support tray **12** of stand **4** and begin to exercise with them. Each dumbbell will carry twenty pounds, namely the first two weights **16** will have been coupled to handle **20** of each dumbbell, just as the user requested when he or she input the weight selection decision into data entry device **62**. However, the actual adjustment will have been made using a motor **46** to actuate selectors **35** of dumbbell **4** without needing further intervention by the user, i.e. without the user having to physically or directly position or manipulate selector **35**. The other unused weights **16** will remain atop stand **4**.

One or more electronic sensors **72** are positioned on support tray **12** to detect the presence of each selectorized dumbbell in the proper weight adjusting position on support tray **12**. For example, two such sensors **72** are shown for each dumbbell, one sensor **72** underlying each of the front and back sides of dumbbell **4** when dumbbell **4** is properly laid down on support tray **12**. Unless sensors **72** determine that selectorized dumbbells **4** are in place, no weight adjustment operation can take place. In other words, even if the user inputs a weight selection decision into data entry device **62**, controller **64** will not activate motor **46** to implement that decision unless sensors **72** have reported to controller **64** that both dumbbells are on stand **4** and are in their proper position. Support tray **12** of stand **4** may have various dumbbell aligning grooves, recesses or detents (not shown) to help the user position each dumbbell **4** in its proper weight adjusting position.

In addition, a pair of mechanical interlock fingers **74** are provided on support tray **12** for each dumbbell to help hold dumbbell **4** securely in place during a weight adjustment operation. Interlock fingers **74** project through slots **76** in support tray **12** from below support tray **12**. Normally, interlock fingers **74** are pivoted outwardly away from one another so that there is sufficient room to place one dumbbell **4** between them. However, once a weight adjustment operation begins, interlock fingers **74** are pivoted or moved by controller **64** towards one another until lips or tabs **78** formed at the top of interlock fingers **74** protrude over or clamp on top of side rails **24** of dumbbells **4**. Interlock fingers **74** physically hold dumbbells **4** on support tray **12** and prevent them from being removed until interlock fingers **74** are pivoted back to their outwardly canted, disengaged position.

Interlock fingers **74** prevent the rotation of driver **58** from simply twisting or rotating dumbbell **4** on stand **4**. Instead, interlock fingers **74** keep dumbbell **4** in place on stand **4** and prevent the torque of driver **58** from twisting or rotating dumbbell **4** around. Instead, the torque of driver **58** is effective to rotate cam **44** to slide pin arrays **36** out a desired amount.

Interlock fingers **74** also comprise a safety feature. Interlock fingers **74** prevent the user from picking up and using dumbbells **4** until the weight adjustment operation is fully and correctly completed. Controller **64** can be programmed to require that a signal be delivered to it in some fashion indicating that each pin array **36** has properly engaged the desired number of weights **16** to handle **20**. If this signal is not received, or if an error signal is received due to overheating or jamming of motor **46** or of drivers **58**, controller **64** will simply leave interlock fingers **74** in their engaged positions to keep dumbbells **4** locked to support tray **12**. This prevents the user from picking up and using a dumbbell **4** in which connecting pins **42** may not have been correctly inserted, thus enhancing safety in the use of dumbbells **4**.

How interlock fingers **74** pivot can be accomplished in various ways. Each interlock finger **74** could be L-shaped and mounted on its own separate pivot beneath support tray **12** to swing lips or tabs **78** on fingers **74** inwardly and outwardly relative to selectorized dumbbells **4**. Or, the vertical portions of fingers **74** that carry lips or tabs **78** could be flexibly or pivotably mounted to a common, vertically movable base with the vertical portions of the fingers simply flexing or pivoting inwardly and outwardly as the base is raised or lowered. Thus, the structure and exact method of operation of interlock fingers **74** can obviously be varied.

A clutch (not shown) could be used somewhere in the drive train between motor **46** and selector **35** of selectorized dumbbell **4**. For example, a clutch could be used between drive shaft **48** of motor **46** and the shaft of drive pulley **50**. Thus, if there was any problem in moving the front and back pin arrays $\mathbf{36}_f$ and $\mathbf{36}_b$ into a selected weight engaging position, due to a malfunction in any of the components of the drive train or to misalignment in any of the components of selector **35**, then the clutch would at some point release or unclutch to prevent damage. Thus, the clutch serves as a safety device and prevents an overload of motor **46** or jamming of selector **35**.

Referring now to FIG. **11**, the motorized system **2** of FIGS. **1-10** could be replaced with a manual system. In the manual system, motor **46** is deleted. The belt drive **52** to the two rotatable drivers **58** is extended out through a slot **80** in column or post **10** of stand **4** into a pulley housing **82** secured on one side of column or post **10**. This pulley housing encloses the drive pulley (not shown) on which belt **52** is entrained. The drive pulley is rotatably coupled to a shaft (not shown) that carries a rotatable thumb or hand wheel **84**. Hand wheel **84** is carried outside of and atop pulley housing **82** to be accessible to the user.

In order to remotely but simultaneously adjust weights **16** of a pair of selectorized dumbbells (not shown in FIG. **11** but like that of FIG. **1**) carried atop support tray **12** (not shown in FIG. **11** but like that of FIG. **1**), the user need only grab and rotate hand wheel **84** to incrementally rotate hand wheel **84**. Hand wheel **84** is preferably provided with a plurality of holes or openings **86** that cooperate with a detent (not shown) on the top of pulley housing **82** for allowing the user to know how far

to incrementally advance hand wheel **84**. In any event, incremental rotation of hand wheel **84** will incrementally advance belt **62** and thus rotate drivers **58** to adjust the weight of selectorized dumbbells **4** as in the embodiment of FIGS. **1-10**, except that the incremental rotation is now being done by a manually operated hand wheel **86** rather than by an electrically powered motor **46**.

In the manual system of FIG. **11**, data entry device **62**, controller **64**, motor **46**, and interlock sensors **72** would all be deleted when the manual system is used as a replacement for the motorized system **2** of FIGS. **1-10**. However, these components could all be kept if the manual system of FIG. **11** is used as a backup for the motorized system **2** of FIGS. **1-10**. In this latter case, the belt drive from motor **46** is simply extended out through the side of column or post **10** of stand **4** and pulley housing **82** and manual hand wheel **84** would be additionally added to stand **4**. Hand wheel **84** would be used in the event of a power failure or the like in order to manually adjust the weight of dumbbells **4**.

Referring now to FIGS. **12** and **13**, it is obvious that selectors **35** of selectorized dumbbells **4** can have many forms that will dictate various different connections to the rotatable drivers **58**. In FIG. **12**, handles **20** for two selectorized dumbbells are shown with weights **16** of dumbbells **4** having been deleted for the purpose of clarity. Handles **20** of dumbbells **4** will be positioned atop support tray **12** of stand **4** similarly to that shown in FIGS. **1-10**, namely overlying interlock sensors **72** and in position to be grabbed or gripped by interlock fingers **74**. The primary difference between this embodiment and what is shown in FIGS. **1-10** is the nature of selector **35** used on each selectorized dumbbell **4**.

As shown in FIG. **13**, each selector **35** comprises a front pin array $\mathbf{36}_f$ and a back pin array $\mathbf{36}_b$ with a plurality of connecting pins **42** contained in a chevron shape and arranged in duplicate left and right sets. This type of selector is shown and described more completely in the assignee's pending patent application Ser. No. 11/498,335 filed Aug. 2, 2006, which application is hereby incorporated by reference.

Each weight **16** will be coupled to handle **20** by a pair of connecting pins **42**, one from the left set and a corresponding one from the right set, that will be thrown or moved outwardly to enter into holes in side rails $\mathbf{24}_f$ and $\mathbf{24}_b$ of each weight **16**. The pairs of connecting pins **42** are thrown beginning with the innermost pair of pins and then progressively moving outwardly through the other pairs of pins. Selector **35** shown in FIG. **13** is designed to pick up six different weights, i.e. there are a total of twelve pins **42** in each pin array $\mathbf{36}_f$ and $\mathbf{36}_b$ with six pins **42** in the left set and six pins **42** in the duplicate right set.

Pins **42** in the front and back pin arrays $\mathbf{36}_f$ and $\mathbf{36}_b$ are thrown outwardly by a rotatable camshaft **87** arranged between the two pin arrays. Camshaft **87** has a plurality of lobes **88** that bear against arrow-shaped heads **90** of the various connecting pins **42**. Heads **90** are spring biased inwardly to abut against the lobes **88** of camshaft **87**. One end of camshaft **87** carries a bevel gear **92**. The end of driver **58** that protrudes through support tray **12** of stand **4** also carries a bevel gear **94**. The two bevel gears **92** and **94** interengage.

When the user inputs a weight selection decision into data entry device **62**, controller **64** effects rotation of motor **46** to incrementally rotate the two drivers **58** for the pair of selectorized dumbbells **4**. This rotates each camshaft **87** identically about the axis of each camshaft **87**. The incremental rotation of camshafts **87** will cause the lobes **88** thereon to incrementally throw connecting pins **42** outwardly in the various pairs thereof beginning with the innermost pair and working outwardly to the outermost pair.



Referring now to FIGS. **14** and **15**, a handle **20** generally similar to that shown in FIGS. **1-10** is illustrated. Handle **20** differs, however, in how front and back pin arrays $\mathbf{36}_f$ and $\mathbf{36}_b$ are slid laterally inwardly and outwardly. Instead of relying upon a double lobed rotatable cam **44** as shown in FIGS. **1-10**, handle **20** has a rotatable drive gear **96**. Drive gear **96** includes a spiral cam slot **98** on each side thereof with only one such cam slot **98** being shown in FIG. **15**. A pin **100** on the adjacent pin array is continuously received in such cam slot **98**. Again, FIG. **15** shows only one such pin **100** with the pin **100** and cam slot **98** on the other side of drive gear **96** being hidden in FIG. **15**.

Rotation of drive gear **96** in opposite directions in FIG. **15** will move pin arrays $\mathbf{36}_f$ and $\mathbf{36}_b$ inwardly and outwardly through the cooperation of pins **100** and cam slots **98**. When drive gear **96** rotates in the direction of the arrow A in FIG. **15**, cam slots **98** acting on pins **100** will retract or slide pin arrays **36** inwardly. Conversely, rotation of drive gear **96** in the opposite direction B in FIG. **15** will cause cam slots **98** to push outwardly on pins **100** to extend or slide pin arrays **36** outwardly. No spring biasing is necessary in this arrangement since cam slots **98** continuously engage pins **100** and push on pins **100** in the appropriate direction regardless of the direction of rotation of drive gear **96**.

Another difference in the embodiment of FIGS. **14** and **15** is that motor **46** used for driving or incrementally rotating drive gear **96** is contained or carried on handle **20** in cavity **34** thereof. Preferably, motor **46** is a stepper motor. Drive shaft **48** of motor **46** carries a worm gear **102**. Worm gear **102** mates with the gear teeth on the outer diameter of drive gear **96**. Motor **46** will be powered in any suitable manner, either by an internally contained battery (not shown) or by a power connection that is made when each selectorized dumbbell **4** is placed on top of support tray **12** in position for a weight adjustment operation.

In using handle **20** of FIGS. **14** and **15**, handle **20** will be placed as in the embodiment of FIGS. **1** and **10** between the nested left and right stacks of weight plates $\mathbf{18}_l$ and $\mathbf{18}_r$ that are disposed atop stand **4**. The user can use data entry device **62** as before to input a weight selection decision. Interlock fingers **74** and interlock sensors **72** will function as before. Controller **64** will then send a signal to the handle carried motors **46**, either by a hardwired connection established when dumbbells **4** are placed on support tray **12** or by a wireless signal, to energize motors **46** to select a desired amount of weight.

Use of a geared electric drive as just described provides additional safety in the use of dumbbells **4**. There are no external tether cords or the like which can catch on obstacles and cause a manually positioned selector pin to dislodge as is the case with prior art selectorized dumbbells. Instead, the stepper motor **46** and its geared connection to selector **35** as in FIGS. **14** and **15** effectively holds or locks selector **35** in place. There are no external parts of selector **35** that can be bumped or hit to cause the selector **35** to dislodge.

FIG. **16** shows a further variation of the embodiment of FIGS. **14** and **15**. In this embodiment, data entry device **62** is also located or carried on handle **20** as is controller **64**. Controller **64** is carried in cavity **34** of handle **20** and is simply wired to motor **46**. Electrical power will be supplied by a battery that is carried somewhere on handle **20**. Handle **20** can itself include a U-shaped auxiliary weight **104** if so desired.

In the FIG. **16** embodiment, the weight on each selectorized dumbbell is set separately and not simultaneously. Each dumbbell **4** carries its own entire weight selection and adjustment system comprising a data entry device **62**, a controller **64**, a motor **46**, and a battery (not shown) for powering the

same. Dumbbells **4** can be adjusted when sitting on a stand **4** like that shown in FIGS. **1-10** or when sitting elsewhere. However, the ability to adjust controller **64** using an electronic data entry device **62** and an electrically operated motor **46** is the same. The user is no longer required to manually reposition or move selector **35** by grabbing selector **35** and applying physical force to the same. Alternatively, a single data entry device **62**, mounted on only one dumbbell **4** or even separately from either dumbbell **4**, could be used to set the weight selection decision for both dumbbells with the weight adjustment then being done either separately or simultaneously using the motor **46** that is part of each dumbbell.

The various embodiments of the invention disclosed herein all have various advantages. The motorized systems shown herein that are operated through an electronic data entry device **62** are all easy and simple to operate. It allows the user to make and input a weight selection decision using a data entry device **62** of the type with which the user is already familiar from many other fields. Both dumbbells **4** can be remotely adjusted since the user need only touch and manipulate data entry device **62** and not dumbbells **4** themselves. This can be done from the side of stand **4** or even further away if data entry device **62** wirelessly communications with controller **64** or motor **46**. Moreover, both dumbbells **4** are simultaneously adjusted. This saves time and is extremely convenient for the user.

In addition, the systems of this invention has various safety features. Interlock sensors **72** prevent a weight adjustment operation from taking place unless dumbbells **4** are properly oriented on support tray **12** of stand **4**. Interlock fingers **74** will grip dumbbells **4** and secure them to stand **4** during a weight adjustment operation. Interlock fingers **74** will not release dumbbells **4** for use unless the weight adjustment operation has been properly performed by system **2**. Accordingly, it minimizes the chance for operator error in adjusting weights **16** and ensures that selector **35** is properly engaged before the user can grip and lift dumbbells **4** off stand **4**.

While the manual system disclosed herein does not incorporate motor activation or an electronic data input entry device, it still features remote and simultaneous actuation of a pair of dumbbells using a single operator, i.e. hand wheel **84**.

Various modifications of this invention will be apparent to those skilled in the art. For example, the term "motor" or "motorized" is not to be limited to the specific type of motor **46** shown herein having a rotatable drive shaft **48**, but is meant to apply to any powered device that converts electrical energy into physical motion, e.g. a solenoid, a magnet, etc. In addition, as shown in FIG. **16**, data entry device **62** could lack a visual display **66** and have only keys or buttons **68**. Thus, this invention is not limited to the specific details of the embodiments disclosed herein.

We claim:

**1**. A weight selection and adjustment system for a selectorized dumbbell, which comprises:

(a) a selectorized dumbbell, which comprises:

(i) a stack of nested left weight plates and a stack of nested right weight plates;

(ii) a handle having a left end and a right end; and

(iii) a movable selector having a plurality of different adjustment positions in which the selector may be disposed, wherein the selector is configured to couple selected numbers of left weight plates to the left end of the handle and selected numbers of right weight plates to the right end of the handle with the selected numbers of coupled weight plates differing depending upon the adjustment position in which the selector is disposed, thereby allowing a user to select for use a desired exercise weight to be provided by the selectorized dumbbell; and

(b) an electric motor that is operatively connected to the selector at least whenever a weight adjustment operation takes place, wherein the electric motor when energized from a source of electric power physically moves the selector into the adjustment position corresponding to the desired exercise weight that was selected for use by the user.

**2**. The system of claim **1**, further comprising:

(a) an electrically operated data entry device to allow the user to input the desired exercise weight; and

(b) a controller operatively communicating with the data entry device and the electric motor for energizing the electric motor from the electric power source to cause the electric motor to move the selector to the adjustment position thereof that corresponds to the desired exercise weight input by the operator into the data entry device.

**3**. The system of claim **1**, wherein the data entry device includes data entry keys or buttons that may be manipulated by the user for allowing the user to input the desired exercise weight into the data entry device.

**4**. The system of claim **3**, wherein the data entry device further includes a visual display for displaying back to the user the desired exercise weight that has been input into the data entry device by the user by manipulation of the keys or buttons.

**5**. The system of claim **2**, further comprising:

(a) a stand on which the selectorized dumbbell is supported during a weight adjustment operation;

(b) wherein the motor is mounted on the stand; and

(c) a driver releasably connected to the selector of the dumbbell when the dumbbell is on the stand with the driver being driven by the motor when the motor is energized.

**6**. The system of claim **5**, wherein the data entry device is also mounted on the stand.

**7**. The system of claim **5**, further comprising a sensor for detecting when the selectorized dumbbell is in a proper weight adjusting position on the stand, and wherein the sensor is operatively connected to the controller for inhibiting a weight adjustment operation unless the sensor reports to the controller that the selectorized dumbbell has been placed in the proper weight adjusting position on the stand.

**8**. The system of claim **5**, further comprising a device configured to grip the selectorized dumbbell for retaining the selectorized dumbbell in the proper weight adjusting position on the stand during a weight adjustment operation.

**9**. The system of claim **8**, wherein the gripping device comprises a plurality of fingers movably supported on the stand for movement between a first position in which the fingers are clear of the selectorized dumbbell and a second position in which the fingers overlie portions of the selectorized dumbbell to hold the selectorized dumbbell in place on the stand.

**10**. The system of claim **9**, wherein the stand comprises an upper support surface on which the selectorized dumbbell is supported when the selectorized dumbbell is in the proper weight adjusting position, and wherein the fingers are pivotal relative to the upper support surface such that the fingers can be swung from the first position in which upper ends of the fingers are swung laterally outwardly of opposed sides of the selectorized dumbbell to the second position in which the upper ends of the fingers are swung laterally inwardly to overlie opposed sides of the selectorized dumbbell.

**11**. The system of claim **10**, wherein the fingers project through slots in the upper support surface with the upper ends of the fingers being continuously located above the support surface as the fingers pivot between the first and second positions thereof.

**12**. The system of claim **1**, further including a plurality of selectorized dumbbells of the type recited in claim **1**, and wherein a single electric motor is operatively connected to the selectors of the plurality of selectorized dumbbells at least whenever a weight adjustment operation takes place such that only one motor adjusts the selectors of both dumbbells substantially simulataneously.

**13**. The system of claim **12**, further comprising:

(a) a stand on which the plurality of selectorized dumbbells are supported during a weight adjustment operation;

(b) wherein the motor is mounted on the stand with the motor having a rotatable motor drive shaft;

(c) a plurality of rotatable drivers corresponding in number to the plurality of selectorized dumbbells on the stand with one driver being releasably connected to the selector of each dumbbell when each dumbbell is on the stand; and

(d) a belt and pulley system connecting the motor drive shaft to the drivers for rotating the drivers substantially simultaneously with rotation of the motor drive shaft.

**14**. The system of claim **13**, wherein the stand comprises an upper support surface on which the selectorized dumbbells are supported during a weight adjustment operation, and wherein the motor and belt and pulley system are mounted on the stand beneath the upper support surface with the rotatable drivers having access through holes in the upper support surface to the selectors of the selectorized dumbbells for coupling to the selectors.

**15**. The system of claim **1**, further comprising:

(a) a stand on which the selectorized dumbbell is supported during a weight adjustment operation;

(b) wherein the motor is mounted on the stand; and

(c) a driver releasably connected to the selector of the dumbbell when the dumbbell is on the stand with the driver being driven by the motor when the motor is energized.

**16**. The system of claim **1**, wherein the motor is mounted on the handle of the selectorized dumbbell and is always operatively coupled to the selector.

**17**. The system of claim **16**, further comprising:

(a) an electrically operated data entry device to allow the user to input the desired exercise weight;

(b) a controller operatively communicating with the data entry device and the electric motor for energizing the electric motor from the electric power source to cause the electric motor to move the selector to the adjustment position thereof that corresponds to the desired exercise weight input by the operator into the data entry device; and

(c) wherein the data entry device and controller are also mounted on the handle of the selectorized dumbbell.

**18**. The system of claim **17**, further comprising a battery mounted on the handle to serve as the electric power source.

**19**. A weight selection and adjustment system for a selectorized dumbbell, which comprises:

(a) a selectorized dumbbell, which comprises:

(i) a stack of nested left weight plates and a stack of nested right weight plates;

(ii) a handle having a left end and a right end; and

(iii) a movable selector having a plurality of different adjustment positions in which the selector may be disposed, wherein the selector is configured to couple selected numbers of left weight plates to the left end of the handle and selected numbers of right weight plates to the right end of the handle with the selected numbers of coupled weight plates differing depending upon the adjustment position in which the selector is disposed, thereby allowing a user to select for use a desired exercise weight to be provided by the selectorized dumbbell; and

(b) means selectively actuable by the user for adjusting the exercise weight of each dumbbell without requiring the user to physically contact and move the selector himself or herself.

**20**. A weight selection and adjustment system for a dumbbell, which comprises:

(a) a dumbbell that provides an exercise weight that is lifted by a user when the user grips and lifts a handle of the dumbbell, wherein the exercise weight provided by the dumbbell is adjustable by coupling more or fewer weight plates to each end of the handle;

(b) an electric motor that may be selectively energized and when energized will cause a desired number of weight plates to be coupled to each end of the handle; and

(c) a data entry device to allow the user to input a weight selection decision that operatively controls the energization of the motor to adjust the exercise weight of the dumbbell in accordance with the weight selection decision input into the data entry device by the user.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO. : 7,578,771 B1 Page 1 of 1
APPLICATION NO. : 11/999742
DATED : August 25, 2009
INVENTOR(S) : Carl K. Towley, III et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Col. 12, Line 20, change “claim 1” to --claim 2--.

Signed and Sealed this

First Day of December, 2009

David J. Kappos
*Director of the United States Patent and Trademark Office*

**CERTIFICATE OF COMPLIANCE**
**PURSUANT TO FEDERAL CIRCUIT RULE 32(b)**

Certificate of Compliance with Type Volume Limitation, Typeface Requirements, and Type Style Requirements:

1. This brief complies with the type volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

   - this brief contains 12,674 words, excluding parts of the brief exempted by Fed. Cir. R. 32(b)(2).

2. This brief complies with the typeface requirements of the Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   - this brief has been prepared in a proportionally spaced typeface, using Microsoft Word 14-point Times New Roman font.

Dated: February 13, 2024

By: /s/ Thomas J. Leach
Thomas J. Leach

*Attorneys for Plaintiff-Appellant*
*PowerBlock Holdings, Inc.*